JOHN BANKS et al., Plaintiffs-Appellees, v. R.D. WERNER COMPANY, Defendant-Appellant (Kipley Construction Company, Defendant; Edwards Engineering Company, Third-Party Defendant-Appellee).

First District (6th Division) No. 1—89—0923

Opinion filed July 27, 1990.

Tribler & Marwedel, P.C., of Chicago (Mitchell A. Orpett and Michael R. Stiff, of counsel), for appellant.

Winkler & Gorey, of North Riverside (Stuart K. Jones, of counsel), for appellees John Banks and Donald Neumann.

Sweeney & Riman, Ltd., of Chicago (Georgene M. Wilson, of counsel), for appellee Edwards Engineering Company.

JUSTICE EGAN delivered the opinion of the court:
This appeal involves settlements between the plaintiffs and their employer, which would operate to bar the defendant's right to contribution from the employer. The trial judge upheld the validity of the settlements. The sole issue is whether the judge's finding that the set-

tlements were made in good faith was against the manifest weight of the evidence.

On July 18, 1986, the plaintiffs, John Banks (Banks) and Donald Neumann (Neumann), were employed by Edwards Engineering Company (Edwards) and were injured when a plywood plank upon which they were standing dislodged from a scaffold, causing the plaintiffs to fall 10 feet to the ground. The defendant, R.D. Werner Co., Inc. (Werner), manufactured the plank. Kipley Construction Company (Kipley) was the general contractor for the work project. Edwards leased the scaffold from a company which is not involved in this case.

On June 9, 1988, the plaintiffs, by their attorney Charles R. Winkler, filed a two-count complaint against the defendants, Kipley and Werner. Count I, naming only Kipley, alleged violations of the Structural Work Act (Ill. Rev Stat. 1987, ch. 48, par. 60 *et seq.*). Count II, naming only Werner, alleged a cause of action in strict tort liability for the unreasonably dangerous defects in the scaffolding plank manufactured by Werner. Both Werner and Kipley filed answers and initiated discovery.

On August 18, 1988, Edwards, which was not then a party to the lawsuit, filed a motion seeking approval of two proposed settlements and good-faith findings pursuant to the Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*). One settlement was between "the plaintiff, John Banks, and Edwards Engineering and Donald Neumann, settling parties, by and through their respective counsel." The other settlement was between "the plaintiff, Donald Neumann, Edwards Engineering and John Banks, settling parties by and through their respective counsel." The motion was submitted jointly by Charles Winkler, as attorney for the plaintiffs, and the firm of Sweeney and Riman, as "attorneys for settling parties."

The text and the substance of the motions were substantially the same. They indicated that, in full settlement of all the individual claims of the respective plaintiffs and against the respective "settling parties," Edwards and Neumann would pay Banks $8,000, and Edwards and Banks would pay Neumann $7,000. The settling parties in the motions sought "discharge from any further liability to the plaintiff or any other tortfeasor pursuant to the common and statutory law of the State of Illinois, including but not limited to the Illinois Contribution Statute." The settlements were contingent upon approval by the trial court, including a finding of good faith under the Contribution Act. Both motions included the affidavit of Winkler, as attorney for the plaintiffs, and the affidavit of Marvin Riman, as attorney for Edwards.

Winkler's affidavit stated that he was the attorney for Banks and Neumann and that he had been involved personally in negotiating each proposed settlement. He believed the settlements to be fair and reasonable to all involved parties and to be in good faith. The motivation of each plaintiff in negotiating each settlement was to advance or maximize that plaintiff's own interest. Winkler was "unaware of any collusion, bad faith or any other improper motivation of any party to the proposed settlement, including any intent to improperly prejudice any person or entity not a party to the proposed settlement."

Riman's affidavit stated that he also believed the settlements to be fair and reasonable to all involved parties and to be in good faith. He said that the motivation of the settling parties in negotiating was to advance or maximize the interest of the settling parties. Again, like Winkler, he was unaware of any collusion, bad faith or any other improper motivation of any party to the proposed settlement.

After the court set a briefing schedule for the motion, the time for Werner's response was extended, and the settling parties were ordered to comply with Werner's discovery requests.

On October 28, 1988, Banks filed answers to the interrogatories of Kipley and Werner. The answers to Werner's interrogatories included as attachments reports prepared by Herbert J. Thomiszer of Triodyne, a consulting firm. Triodyne had performed an inspection and analysis of the scaffolding for Edwards' workers' compensation carrier, American Country Insurance Company (American Country). Thomiszer stated, "With regard to the scaffold deck, it is my opinion that the artifact scaffold deck was foreseeably, unreasonably dangerous."

On October 25, 1988, Werner deposed Riman. Riman initially was retained by American Country during the insurer's defense of the workers' compensation claim against Edwards. Riman was not responsible for the workers' compensation matter but was solicited for an opinion regarding the common law and statutory aspects of the plaintiffs' accident; he prepared a written opinion regarding the matter, consulted with the engineers from Triodyne, discussed the case with the plaintiffs' attorney, participated in the preparation of the proposed settlement agreement and drafted his affidavit.

Before negotiating the proposed settlement, Riman consulted with American Country and his partner handling the workers' compensation claim; he read his firm's file on the workers' compensation claim. Riman contacted Winkler and told him that "he had a crappy case as far as [Riman's] people were concerned." He told Winkler, "As far as I was concerned if he was thinking about a structural case I don't

think he had a valid structural case, but I told him I thought I could probably give him a pretty good products case." Riman supported his opinion regarding the Structural Work Act case as follows:

"[T]he reason I thought he had a cruddy case on the Structural Work Act *** was that as far as I was concerned there was no willful violation, and there couldn't be any evidence of a willful violation as I understood the facts. Plus the fact that I told him I could probably give him a decent products case."

Riman also said that the statements of Banks and Neumann regarding the erection of the scaffold, what they were doing and how they got there contributed to his conclusion that the structural case was not a good one.

Riman described his negotiations with Winkler as follows:

"A. I told [Winkler] I would get him about $15,000, and I would split it just about evenly. Although, I thought one of his men probably lost a little bit more time than the other. And as far as I was concerned, the money wasn't really terribly important. It was kind of a cost of defense off [sic: offer?]. And of course I would give him the information we had that would provide him with the basis for a products liability claim against the two [sic] tortfeasors.

Q. So you exchanged information or you gave him information from your files?

A. I gave him information from my files. I got nothing from him.

Q. He eventually agreed to the $15,000 price?

A. Yes. I think he was impressed with what I said."

Riman thought that "[the $15,000] plus the fact that [he] had provided information to the plaintiffs' attorney about what the proximate cause of the injuries may have been and also provided him with information which was valuable and costly, that [was] an additional consideration."

Riman based his opinion regarding the existence of a good products liability case on the report of Thomiszer, the engineer hired by Triodyne, whom American Country retained for analysis of the scaffold. Riman specifically recalled that the report indicated that the hooks on the scaffold were unreasonably dangerous, that the manufacturer used the wrong steel and that the failure of the hooks resulted from that design defect. Riman concluded that these points were "sufficient for [him] to reach the legal opinion that there was a products failure, and *** that a products liability case was viable."

Before the filing of the proposed settlement, Riman had available to him some information from his firm's workers' compensation file

regarding the damages suffered by the plaintiffs. That information included the medical reports and information regarding loss of earnings and time lost from employment by Banks and Neumann.

On October 6, 1988, Werner deposed Winkler. Winkler based his opinion that the settlement was fair and in good faith on the Triodyne report indicating that a defective scaffold plank caused the plaintiffs' injuries; the expert Thomiszer had also reported that in his opinion few workers or contractors would inspect on a daily basis a scaffold such as was used. One reason was that the defect was not readily "visible and/or understandable as to its significance." Winkler estimated the combined liability of Kipley and Edwards to be no more than 10% of the total case, which he valued at about $300,000 for both plaintiffs. He indicated that he based his settlement on 10% of $300,000, divided evenly between Kipley and Edwards which comes to $15,000 for each. His 27 years' experience in personal injury litigation contributed to his opinion.

Winkler acknowledged the existence of a $40,000- to $50,000-compensation lien which had not been waived and which would, if American Country insisted on full payment, be payable out of any subsequent recovery by the plaintiff against Werner. He claimed that no thought was ever given to the lien because "the law is very clear that *** the plaintiffs would have to pay that back if [they] were successful." He knew of no agreement or understanding between the parties that the workers' compensation carrier would not seek to enforce its lien. Nor did he know if the carrier would seek 100% recovery of its lien.

On November 9, 1988, Kipley received leave to file a third-party complaint against Edwards. Edwards was given leave to file its appearance and to incorporate its previously filed petition for a good-faith finding as its motion to dismiss Kipley's third-party complaint.

On December 19, 1988, Kipley filed a motion for a good-faith finding of a settlement between Kipley and the plaintiffs. The plaintiffs were to receive $2,500 from Kipley. Werner did not file a response to this motion.

On February 1, 1989, Neumann filed his answers to Werner's interrogatories. His answers provided basically the same information as had Banks' answers to interrogatories filed in October 1988.

On March 3, 1989, the judge conducted a hearing on the motions regarding the proposed settlements. In Werner's response to the plaintiffs' and Edwards' motion to approve the settlement, Werner relied on the answers to interrogatories by Banks, the deposition of Banks, documents from Edwards, documents and photographs from

Triodyne, and the depositions of Winkler and Riman. At the conclusion of the hearing, the trial judge said the following:

"I will grant the petition. As I said before the conditional aspect of the settlement is not sufficient to destroy the petition. Additionally, I think to include the company employees [Banks and Neumann] in the petition is also reasonable due to the fact that the settlement joint tortfeasor[,] if liable for the negligent act, it is reasonable to include them.

And, lastly, I find it to be in good faith as the expert stated that the scaffold defect would be very difficult to detect with the human eye and, therefore, the potential liability of the employer [Edwards] and the general contractor [Kipley] would be minimal.

And the deposition of plaintiff's attorney [Winkler] was taken as an experienced attorney, and he has evaluated the case[,] and I am not going to disagree with his evaluation of the case either."

The judge also found that Werner had sufficient opportunity to investigate the good-faith issue.

The judge entered three orders: He approved the settlement between Banks as a plaintiff and Neumann and Edwards as settling parties; he approved the settlement between Kipley and the plaintiffs Banks and Neumann; and he approved the settlement between Neumann as a plaintiff and Banks and Edwards as settling parties. Werner appeals only from the order approving the settlement between Neumann as plaintiff and Banks and Edwards as settling parties.

A discussion of the applicable law must begin with the Contribution Act itself. The pertinent provisions of the Act are as follows:

"(c) When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater.

(d) The tortfeasor who settles with a claimant pursuant to paragraph (c) is discharged from all liability for any contribution to any other tortfeasor." Ill. Rev. Stat. 1987, ch. 70, pars. 302(c), (d).

■■■ A recent case construing the Act involved a settlement between an employee and employer. (*Wilson v. The Hoffman Group, Inc.* (1989), 131 Ill. 2d 308, 546 N.E.2d 524.) In that case the court held that all the surrounding circumstances must be considered in determining whether an agreement was made in good faith. It also held that once a preliminary showing of a good-faith settlement has been made, the burden shifts to the party challenging the settlement to establish that it was not made in good faith.

The court also expressly overruled *LeMaster v. Amsted Industries, Inc.* (1982), 110 Ill. App. 3d 729, 442 N.E.2d 1367, which had held that a settlement between an employee and his employer lacked consideration and was not in good faith because the employee had no rights which he could relinquish in exchange for a workers' compensation lien waiver and a cash payment. In overruling *LeMaster*, the supreme court reasoned thus:

> "It would be incongruous for us to hold that while an employer is subject to liability in tort under the Contribution Act, it cannot avail itself of the Act's provisions to discharge that liability. Consequently, we hold that [the employee's] release constituted consideration under the Contribution Act and that its acceptance constituted a valid settlement between [the employee] and [the employer]." *Wilson*, 131 Ill. 2d at 318.

The supreme court in *Wilson* made no expression as to the required standard of proof. The appellate courts that have addressed the issue have uniformly held that where a preliminary showing of good-faith settlement is made, a presumption of validity arises and that the burden shifts to the party opposing settlement, who must prove by clear and convincing evidence that the settlement is invalid. (See, *e.g., Ruffino v. Hinze* (1989), 181 Ill. App. 3d 827, 537 N.E.2d 871; *Wasmund v. Metropolitan Sanitary District* (1985), 135 Ill. App. 3d 926, 482 N.E.2d 351.) Our task, therefore, is to determine, as a matter of law, whether the plaintiffs and Edwards have made a preliminary showing of good faith, and if so, whether Werner has overcome the presumption of validity of the agreement by clear and convincing evidence.

■■ Edwards has paid, and the plaintiffs have received, a total of $15,000 which may be the only money the plaintiffs will receive other than workers' compensation awards. In addition, Edwards has made the plaintiffs aware of an expert who will assist the plaintiffs in establishing their case against Werner. In return Edwards has received a release from the plaintiffs for any potential tort liability to them. Therefore, under *Wilson* the agreement was supported by some consideration.

■ We are not persuaded to hold otherwise because the workers' compensation carrier, American Country (not Edwards), has so far not waived its lien. Failure of even an employer to waive a workers' compensation lien does not *ipso facto* render a settlement invalid as having been made in bad faith. (*Cleveringa v. J.I. Case Co.* (1989), 192 Ill. App. 3d 1081, 549 N.E.2d 877.) For comparison purposes the defendant cites a number of cases which upheld settlements. In all these cases the employers (or the workers' compensation carriers) waived their lien. From those cases, the defendant extracts a legal principle that failure to waive the lien renders the settlement invalid. The defendant's conclusion is based on faulty logic. It is true that the evidence of consideration in those cases was stronger than the evidence in this case. However, the test is not whether the evidence of consideration could have been stronger in this case; the test is whether it was strong enough.

The plaintiffs also established that their lawyer of 27 years' experience, specializing in the practice of personal injury law, made a judgment that the Structural Work Act case against Kipley and Edwards was a weak one. That his judgment was not a result of collusion with Edwards is buttressed by the fact that he settled the case with the general contractor, Kipley, for only $2,500. In our judgment, the plaintiffs and Edwards made a sufficient preliminary showing of good faith that shifted the burden to Werner to overcome that showing by clear and convincing evidence.

Werner relies on the following arguments:

(1) Edwards has not waived its workers' compensation lien; therefore, the consideration flowing to the plaintiffs is virtually nonexistent.

(2) Because the plaintiffs were represented by the same attorney, Winkler, the agreement between the plaintiffs was not made in good faith.

(3) The settlements were entered into only two months after the suit was filed.

(4) The "provision" by Edwards to the plaintiffs of the expert's opinions indicates a lack of good faith.

(5) Winkler's investigation of the potential case against Edwards was perfunctory and, therefore, legally insufficient.

We will first consider the argument that Winkler represented both plaintiffs and that, therefore, a potential conflict of interest existed between Banks and Neumann (an argument not made in the trial court). As an abstract proposition, that *might* be true. We emphasize that it might be true because we are unable to reasonably conjure any

set of facts that would establish any cause of action by Banks against Neumann or by Neumann against Banks.

At this juncture it is appropriate to discuss the procedures followed by the parties in the trial court, because Werner suggests in this court that its ability to present evidence was curtailed in the trial court. The record does not support that suggestion as the trial judge so found.

■ Beginning on August 30, 1988, Werner was given a number of extensions of time to respond to the motion for approval of a good-faith settlement. Werner filed its response on December 14, 1988, 3½ months later. Although the response complained that "there has been little time to conduct thorough discovery in this case," Werner did not make any request for any additional time. Banks had answered interrogatories and had been deposed. At the time of the hearing, Neumann had answered interrogatories. Werner's response expressly noted that it was relying in part on Banks' answers to interrogatories and Banks' deposition. And yet, Werner made no showing in the trial court or in this court of any possible cause of action between Banks and Neumann. Consequently, we must infer that there is none and that no conflict of interest existed because of Winkler's representation of both plaintiffs.

We have already answered Werner's argument that the failure of Edwards to waive its workers' compensation lien necessarily precludes the finding of a good-faith settlement.

Werner's third and fifth arguments may be treated together. It argues that lack of good faith is illustrated because the settlements were entered into only two months after the suit was filed and that Winkler's investigation of the potential case against Edwards was perfunctory and, therefore, legally insufficient.

■ We know of no case that considered significant the time lapse between the filing of the complaint and the proposed settlement. In any event, the record is clear that Triodyne first made its report to American Country in June 1987; it made another report on August 18, 1987; and a final report on September 14, 1987. Riman examined the reports of Triodyne and contacted Winkler *before* the suit was filed. Considering the sequence of events to which Riman testified, it is fair to assume that the initial conversation between Riman and Winkler took place, at the latest, around September 14, 1987, nine months before the suit was filed. Consequently, the two-month lapse of time between the filing of the suit and the date of settlement has no significance.

Similarly, it cannot be said that Werner has shown inadequate in-

vestigation, as a matter of law, on the part of Winkler. Winkler, as noted, has been specializing in the practice of personal injury law for over 27 years. It would unduly lengthen this opinion to repeat all of his deposition testimony. It is enough to say that his answers disclose sufficient investigation of the plaintiffs' claims on his part and substantial reasons in support of his judgment to settle with Edwards.

In oral argument in this court, Werner's attorney has asked this court to express, as a matter of law, minimum standards of conduct to be followed by settling attorneys in investigating claims. We must decline to do so; if such an expression is to be made, it must be made by the highest court of review of this State, not an intermediate one.

■ Werner's last argument focuses on the expert's report that Riman made available to Winkler. The following are expressions of Werner in describing the effect of the Triodyne reports: "Edwards, in collusion with Neumann, has created and managed testimony unfavorable to Werner"; "Edwards, Banks and Neumann have reduced the Contribution Act to a litigant's black market where evidence can be created by one party and bartered and sold to another away from the watchful eye of formal discovery anticipated by the Illinois Supreme Court Rules."

Werner's argument and quoted statements, in our judgment, would have been better left unsaid. There is nothing in the record to support the statement that Edwards "created" or "managed" testimony. Riman's firm was retained by American Country to represent Edwards in the plaintiffs' workers' compensation claim. Riman was asked to render an opinion as to Edwards' common law or statutory liability. Before rendering his opinion he examined a report from Triodyne, the expert *that American Country had already retained.* After noting some ambiguities in the report, he conferred with Triodyne. After resolving those ambiguities, he concluded that the Structural Work Act case against Edwards was extremely weak. He anticipated, correctly, that if Edwards was named as a third-party defendant, it would incur costs of defense expenses. In a desire to extricate his client from what he considered to be nonexistent liability, *he* contacted Winkler. Consequently, Banks and Neumann had no knowledge of the Triodyne report until after Riman contacted Winkler. American Country, not Edwards, retained Triodyne. Therefore, it is manifestly unfair to suggest that Edwards, Banks and Neumann "created" and "managed" the Triodyne report. In sum, there is no proof, there is not even a hint, of any improper conduct on the part of Edwards, Banks, Neumann, Riman or Winkler.

This case, like so many other cases, involves the discretion of a

trial judge. Our response, like the response of reviewing courts in so many other cases, is that it is not our function to substitute our judgment for that of the trial judge unless it is clear to us that the trial judge abused his discretion. Considering the totality of the circumstances, we cannot say that the judge abused his discretion.

Werner next argues that the motion for a good-faith finding constituted an improper request for an advisory opinion. It is Werner's contention that Edwards should not have been permitted to obtain a ruling that a proposed settlement, which was conditioned upon the issuance of a good-faith finding, would be made in good faith. In other words, Edwards should have settled and taken its chances that the trial court would uphold the settlement. We have found no case precisely in point. The cases cited by Edwards are not apposite. In *Wilson v. The Hoffman Group, Inc.* (1989), 131 Ill. 2d 308, 546 N.E.2d 524, the trial court initially refused to certify the settlement as being in good faith; the settling parties then "waived the condition that a good-faith finding be entered, and consummated the settlement." (131 Ill. 2d at 312.) In *Dixon v. Northwestern Publishing Co.* (1988), 166 Ill. App. 3d 745, 520 N.E.2d 932, the parties did enter into a conditional settlement, but the conditional nature of the settlement was not addressed in the appellate court's opinion.

Werner relies on *Madison Associates v. Bass* (1987), 158 Ill. App. 3d 526, 511 N.E.2d 690. That case involved a landlord's suit on a lease; the lessee counterclaimed and alleged that the landlord had fraudulently induced him to sign a settlement agreement. The trial judge entered summary judgment for the landlord on the fraud counterclaim. The appellate court held that the landlord had established a settlement document, "legal and binding on its face," that the burden then shifted to the tenant to show that the settlement was invalid and that the tenant had not done so. That case also is not in point.

■ We believe, however, that the judge's order was not merely an advisory opinion; that it was in the nature of a declaratory judgment. It is true that Edwards filed the motion before establishing that an actual controversy existed between Edwards and Werner. (See *Clyde Savings & Loan Association v. May Department Stores* (1981), 100 Ill. App. 3d 189, 426 N.E.2d 955.) But it is now apparent that a controversy does exist between them. Therefore, no purpose would be served by remanding this cause for a new hearing only to have the motion recaptioned a complaint for declaratory judgment. The substance of the pleading should be considered rather than the form. See *Quinlan & Tyson v. City of Evanston* (1975), 25 Ill. App. 3d 879, 324 N.E.2d 65.

■ Werner's final argument is that the proposed settlement is so disproportionate to the culpability of the parties that the operation of the Contribution Act in this case deprives Werner of a "complete and full remedy" in violation of article I, section 12, of the Illinois Constitution of 1970. The cited constitutional provision states as follows:

"Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." Ill. Const. 1970, art. I, §12.

The court in *O'Connor v. Pinto Trucking Service, Inc.* (1986), 149 App. 3d 911, 501 N.E.2d 263, addressed virtually the same argument and found no constitutional violation. Werner attempts to distinguish this case from *O'Connor* on the basis that Werner is complaining of an incomplete remedy, rather than no remedy at all, which was the argument raised in *O'Connor*. We believe that the distinction suggested by Werner is no distinction and that *O'Connor* is controlling.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

LaPORTA, P.J., and RAKOWSKI, J., concur.