LINNEA PRITCHARD *et al.*, Plaintiffs-Appellees, v. SWEDISH-AMERICAN HOSPITAL, Defendant-Appellant (Richard Runstrom *et al.*, Defendants; Jeffry S. Spears, Contemnor-Appellant).

Second District No. 2—88—0731

Opinion filed November 29, 1989.

Diane I. Jennings, Hugh C. Griffin, and Lisa A. Jensen, all of Lord, Bissell & Brook, of Chicago (Jeffry S. Spears, of counsel), for appellants.

Herbert I. Greene, of Greene, Bowman, Flaherty & McCarty, of Rockford (William M. Flaherty, of counsel), for appellees.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiffs, Linnea Pritchard and Edward Pritchard, brought an action for medical malpractice in the circuit court of Winnebago County against defendants, SwedishAmerican Hospital (the hospital), Dr. Richard Runstrom, Dr. W. Donald Jones, Dr. Novella A. Schafer, and Dr. Adrienne Butler. During discovery, the hospital objected to certain interrogatories submitted to it by plaintiffs. The hospital maintained the interrogatories sought information protected from disclosure by one or more of the following statutes: the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101 *et seq.*) (Medical Studies Act), the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1987, ch. 91½, par. 801 *et seq.*), and the physician-patient privilege (Ill. Rev. Stat. 1987, ch. 110, par. 8—802). Following a hearing on plaintiffs' motion to compel answers to the interrogatories in question, the trial court entered a written order on June 30, 1988, compelling the hospital to answer. Jeffry Spears, counsel for the hospital, refused to answer the interrogatories. On July 7, 1988, the court held him in contempt and fined him $25. This appeal ensued.

On appeal, contemnor Jeffry Spears and defendant Swedish-American Hospital set forth four contentions of error: (1) that the trial court erred in ordering the hospital to disclose information that was privileged and confidential under the Medical Studies Act; (2) that the trial court erred in ordering the hospital to disclose any mental evaluations of defendant Dr. Runstrom, as such information was privileged under the Mental Health and Developmental Disabilities Confidentiality Act; (3) that the trial court erred in ordering the hospital to disclose information concerning the medical treatment of Dr. Runstrom, as the physician-patient privilege prohibited the discovery of that information; and (4) that the trial court erred in ordering the hospital to answer the interrogatories in question, as they were overly broad and sought information irrelevant to the issues in the instant case.

In their medical malpractice complaint, plaintiffs made numerous allegations of negligence against the physician defendants regarding the care rendered during Linnea Pritchard's June 17 to June 30, 1984, confinement as a patient in SwedishAmerican Hospital, including failure to order proper tests and treatment, failure to obtain proper consultations with specialists, inadequate monitoring of her condition, allowing her to develop hyponatremia and central pontine myelinolysis, and negligent administration of hypertonic saline solutions instead of normal saline to correct her hyponatremia. Plaintiffs made many of the same allegations against the hospital, under a *respondeat superior* theory, and further alleged that the hospital negligently rendered hospital services, failed to intervene in Linnea Pritchard's care, and allowed Dr. Richard Runstrom to maintain hospital privileges.

Plaintiffs engaged in substantial written and deposition discovery directed to their various theories against the defendants, including the hospital. Thus far, plaintiffs have discovered, among other things: the hospital's bylaws; the bylaws, rules and regulations of the hospital's medical staff; information concerning the hospital's licensure and accreditation; and the forms used in the reappointment of physicians to the hospital's staff. Plaintiffs have deposed or noticed the depositions of each defendant physician; the hospital's president; various members of the hospital's executive committee and credentials committee; all 17 nurses who were involved in Linnea Pritchard's care; and Dr. Kenneth Skaar, who plaintiffs advised the circuit court is Dr. Runstrom's brother-in-law and a fellow member of the hospital medical staff and who "has extensive information as to the physical and mental condition of Dr. Runstrom and other facts which might have a

bearing upon Dr. Runstrom's competency to practice medicine."

Part of the deposition discovery focused on the general procedures and criteria established by the hospital in granting and reviewing a physician's privileges. Plaintiffs disclosed to defendants that one of their expert witnesses, Dr. John Porterfield, would testify that the hospital deviated from the standard of care in the manner in which it reviewed and renewed Dr. Runstrom's privileges.

Plaintiffs' second set of interrogatories to the hospital is the subject of this appeal. These interrogatories, which were answered in part, sought information concerning: (1) the hospital's suspension or restriction of Dr. Runstrom's privileges; (2) the information relied upon and the investigations undertaken by the hospital's peer review committee in reviewing Dr. Runstrom's staff privileges and clinical competency; and (3) the medical care, including mental health care, that Dr. Runstrom received as a patient at the hospital.

The hospital answered in full interrogatory Nos. 1 and 2, which asked the effective dates of any suspension or restriction of Dr. Runstrom's medical staff privileges, the nature of the restrictions, the conditions imposed upon the privileges by the restrictions, and the dates upon which any suspension or restriction ended. Specifically, the hospital disclosed that Dr. Runstrom's staff privileges had been suspended on October 6, 1975, and reinstated on February 3, 1976. These privileges had been suspended a second time on October 25, 1984, and had not been reinstated.

Interrogatory No. 3 requested:

"If the answer to Interrogatory No. 1, above, is in the affirmative, please state what steps the defendant hospital took to supervise Dr. Runstrom when he was admitting patients and/or treating patients at the defendant hospital, following the termination or conclusion of each such period of suspension or restriction of his privileges as a member of the medical staff of defendant hospital."

The hospital objected to interrogatory No. 3 on the ground that what the interrogatory actually sought was not the discoverable results of the internal review of Dr. Runstrom's privileges and clinical competency, but the nature and content of the hospital's peer review process itself. The hospital maintained that the information sought was privileged and confidential under the Medical Studies Act (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101 *et seq.*).

Interrogatory No. 4 requested the hospital to state:

"(a) whether the defendant hospital *** [after any suspension] required Dr. Runstrom to submit any evidence of his men-

tal, emotional or physical condition other than and in addition to, the uniform application for reappointment to the medical-dental staff, and if so,

> (1) the dates upon which the defendant hospital required Dr. Runstrom to do so;
>
> (2) the nature of the evidence of his mental, emotional or physical condition which the defendant hospital required Dr. Runstrom to submit in each instance.
>
> (b) whether the defendant hospital *** [after any suspension] required Dr. Runstrom to submit to any medical, or psychiatric examinations, tests or treatments, and if so,
>
> (1) the dates upon which the defendant hospital required Dr. Runstrom to do so;
>
> (2) the person or persons to whom Dr. Runstrom was required to submit himself for examinations, tests or treatments in each such instance;
>
> (3) whether the defendant hospital required written reports to be made of the results of each such examination, test or treatment; and
>
> (4) who chose the person or persons to whom Dr. Runstrom was required to submit himself for examinations, tests or treatment in each such instance."

The hospital objected to this interrogatory on the ground that it requested information privileged and confidential, not only under the Medical Studies Act, but also under the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1987, ch. 91½, par. 801 *et seq.*) and the physician-patient privilege (Ill. Rev. Stat. 1987, ch. 110, par. 8—802). The interrogatory was also objected to as overly broad and seeking irrelevant information.

The hospital raised the same objections to interrogatory No. 6, which requested it to state the following:

> "(a) on how many occasions Richard Runstrom was a patient at SwedishAmerican Hospital;
>
> (b) on what specific dates was Richard Runstrom a patient at SwedishAmerican Hospital;
>
> (c) on each such occasion, was Richard Runstrom admitted as an in-patient, or treated on an out-patient basis;
>
> (d) on each such occasion, who was the admitting or principal treating physician;
>
> (e) on each such occasion, what was the admitting or original diagnosis and what was the discharge or final diagnosis; and

(f) on each such occasion, what was the nature of all exami-
nations, tests or treatment rendered."

Subject to objections, the hospital answered this interrogatory in part by disclosing that Dr. Runstrom had been an inpatient at the hospital in December 1971, November 1972, and November 1973. The hospital refused to answer the balance of the interrogatory, incorporating by reference its objections to interrogatory No. 4, especially the physician-patient privilege and mental health privilege. The hospital further refused to identify each and every outpatient test or treatment Dr. Runstrom had ever received as a patient "because of the undue burden," in examining all outpatient records of the various departments over a period of 63 years, Dr. Runstrom's age at the time of the occurrence.

On May 2, 1988, plaintiffs moved to compel complete answers to interrogatory Nos. 3, 4, and 6. The hospital filed a written response in support of its objections. Included with that response was evidence, in the form of the hospital's medical staff bylaws, portions of depositions taken of certain physicians on the hospital's staff, and the affidavit of Dr. Robert Klint, chief executive officer of the hospital, demonstrating that information responsive to interrogatory No. 4 was an integral part of the hospital's credentials committee's review of a physician's privileges. That evidence showed that the credentials committee had the authority to require a physician "to submit any evidence of his current health status requested by the executive committee of the medical staff."

The hospital's medical staff bylaws demonstrated that a physical or mental examination was required for use in the credentials review process when the circumstances warranted such investigation into a physician's health status. The bylaws provided:

"When appropriate, the Credentials Committee may require an impartial physical or mental examination as part of the reapplication process or during the appointment year to aid it in determining whether clinical privileges should be granted or continued and shall require that the results be made available for the committee's consideration."

The bylaws also provided that during a physician's term of appointment, if a specific question was raised as to his competency or his care of patients, the hospital's credentials committee could institute an investigation and make recommendations for reduction, suspension, or revocation of his clinical privileges. The affidavit of Dr. Robert Klint, chief executive officer of the hospital, stated that all information required or considered in the process of reappointment or

in a special investigation was considered and treated as confidential by the hospital.

The hospital also submitted evidence showing that the information requested by interrogatory No. 3 would disclose the nature and content of the various peer reviews of Dr. Runstrom, in addition to any investigations undertaken by the credentials committee during the doctor's reappointment process or any special investigations. Dr. Klint's affidavit set forth specific examples of peer review activities at the hospital, including reviews of patient deaths, utilization review, reviews of medical care, and reviews of patient charts. Dr. Klint stated that these activities were considered and treated as confidential by the hospital. Dr. Klint also stated that the disclosures sought in interrogatory Nos. 3 and 4 would invade the confidentiality of in-hospital review activities and, thus, "would severely hamper our ability to enlist the full cooperation and participation of the independent physicians on the medical staff in the review of their peers."

On May 26, 1988, the circuit court heard argument on plaintiffs' motion to compel. On June 16, 1988, the court orally granted plaintiffs' motion and ordered the hospital to fully answer interrogatory No. 3, specifically requiring disclosure of information such as chart, medical care, and death reviews; interrogatory No. 4, requiring disclosure of any mental or physical examination or other evidence of health status that was requested in consideration of Dr. Runstrom's privileges; and interrogatory No. 6, requiring disclosure of medical or psychiatric care and treatment Dr. Runstrom received. The court acknowledged that some of its rulings were not consistent with its previous rulings (*e.g.*, in 1986, the court had quashed two subpoenas issued by plaintiffs' counsel for medical and psychiatric records pertaining to Dr. Runstrom) but that the "case has to get over with somehow." The court entered a written order on June 30, 1988, incorporating its oral ruling.

On June 30, 1988, Jeffry Spears, counsel for the hospital, filed a response to the court's ruling, declining to furnish the requested information. The court found attorney Spears in contempt of court and assessed a fine in the amount of $25. The hospital and Spears appeal from the court's ruling granting the plaintiffs' motion to compel and from the order of contempt.

The hospital argues that the trial court erred in ordering the hospital to disclose information that was privileged and confidential under the Medical Studies Act (the Act) (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101 *et seq.*). It is the hospital's position that the information to be disclosed, pursuant to plaintiffs' interrogatory Nos. 3 and 4,

would reveal the specific nature and content of any peer review conducted by hospital committees, particularly the credentials committee, concerning Dr. Runstrom's privileges and work; the specific inquiries made by the committee reviewers; and the specific nature of information, data, and other materials considered by the committee reviewers. Such discovery, the hospital maintains, would invade the committee-peer-review process itself and is, therefore, prohibited by both the plain language of the Act and the Illinois cases construing the Act.

■ The Medical Studies Act provides in pertinent part:

"All information, interviews, reports, statements, memoranda or other data of the *** committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees *** used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care, shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges ***." (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101.)

Under the Act, both the discovery and the use, as evidence, of such information are prohibited. (Ill. Rev. Stat. 1987, ch. 110, par. 8—2102.) Moreover, the improper disclosure of such privileged information constitutes a Class A misdemeanor. Ill. Rev. Stat. 1987, ch. 110, par. 8—2105.

■ The purpose of the Act

"is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care. The Act is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues." (*Jenkins v. Wu* (1984), 102 Ill. 2d 468, 480.)

Since its original enactment in 1961, the Act has been repeatedly amended. Each amendment has broadened the statutory privilege, further restricting access to privileged information. See *Sakosko v. Memorial Hospital* (1988), 167 Ill. App. 3d 842, 845 (discussion of various amendments).

■ Although the Act might in some cases inconvenience medical malpractice plaintiffs in their ability to discover some information that may be relevant to their action, the Act does allow for the discovery

of a patient's own records. (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101.) Additionally, medical malpractice plaintiffs not only have full and complete access to their own records but also can depose all persons involved in their treatment and engage experts to give opinions as to the quality of care received. *Jenkins*, 102 Ill. 2d at 479.

In the instant case, the plaintiffs have already discovered, among other things, the hospital's bylaws; the bylaws, rules, and regulations of the hospital's medical staff; information concerning the hospital's licensure and accreditation; and the identity of the nurses involved in plaintiff Linnea Pritchard's care. Plaintiffs have deposed or noticed the depositions of each defendant physician, the hospital's president, and various members of the hospital's executive committee and credentials committee. Additionally, the court granted plaintiffs leave to take the deposition of Dr. Kenneth Skaar, who, plaintiffs advised the court, was defendant Dr. Runstrom's brother-in-law, as well as a fellow member of the hospital's medical staff, and who had "extensive information as to the physical and mental condition of Dr. Runstrom and other facts which might have a bearing upon Dr. Runstrom's competency to practice medicine."

Further, plaintiffs disclosed to the hospital the identity of two physicians whom plaintiffs might call as expert witnesses at trial to testify regarding the medical standards of care applicable to the defendant doctors as well as to the hospital.

■ In light of the discovery which plaintiffs have already pursued, and can still pursue, as well as the experts they may call to testify, any denial of the information sought by plaintiffs in the interrogatories in question should have little impact, if any, on their ability to maintain their cause of action. Moreover, in light of the language of the Act, as well as the purposes to be served by the statute, we believe that the information sought in the interrogatories is protected by the Act.

Plaintiffs' interrogatory No. 1 sought to determine if Dr. Runstrom's privileges as a member of the medical staff of the hospital had ever been suspended or restricted. Subject to its objection that this interrogatory was overly broad and sought irrelevant information, the hospital answered in the affirmative. In response to plaintiffs' interrogatory No. 2 the hospital set forth the specific dates of any suspension or restriction of Dr. Runstrom's privileges, the dates upon which such restriction or suspension was terminated, and the specific nature of the restrictions. The hospital refused, however, to answer interrogatory No. 3 because, the hospital maintained, the interrogatory sought information that was privileged and confidential

under the Act.

Interrogatory No. 3 requested:

"If the answer to Interrogatory No. 1, above, is in the affirmative, please state what steps the defendant hospital took to supervise Dr. Runstrom when he was admitting patients and/or treating patients at the defendant hospital, following the termination or conclusion of each such period of suspension or restriction of his privileges as a member of the medical staff of defendant hospital."

 The Act makes confidential "all information, interviews, reports, statements, memoranda or other data" of hospital committees, such as the credentials committee, used for internal quality control or for improving patient care, including information used for limiting and revoking privileges. (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101.) Under the plain language of the Act, the restrictions imposed by a hospital on a particular physician's privileges to practice as a result of the internal review process are discoverable (see *Richter v. Diamond* (1985), 108 Ill. 2d 265, 269-70; *Gleason v. St. Elizabeth Medical Center* (1985), 135 Ill. App. 3d 92, 94-95), but the nature and content of the process itself, which is the type of information sought in plaintiffs' interrogatory No. 3, is privileged and confidential. That the nature and content of the peer review process was the information sought by interrogatory No. 3 is evident from the court's ruling. The court determined that interrogatory No. 3 required disclosure of any peer review of the medical care and charts of Dr. Runstrom's patients, including any death cases, as well as disclosure of what type of information was considered by the hospital in supervising the doctor's admission and/or treatment of patients at the hospital. The information, ordered by the court to be disclosed, fell well within the scope of section 8—2101 of the Act and was privileged.

Had the trial court limited the material to be discovered to that required in the *Richter* and *Gleason* cases we would have no trouble in affirming the trial court. However, in this case the trial court's order exceeded the scope of the inquiry allowed in the cited cases and, therefore, fell in contravention of the statutory prohibition.

Likewise, the information sought in plaintiffs' interrogatory No. 4, which the court stated was similar to, but more specific than, that sought in interrogatory No. 3, was also privileged. Interrogatory No. 4 requested the hospital to state:

"(a) whether the defendant hospital *** [after any suspension] required Dr. Runstrom to submit any evidence of his mental, emotional or physical condition other than and in addition

to, the uniform application for reappointment to the medical-dental staff, and if so

(1) the dates upon which the defendant hospital required Dr. Runstrom to do so;

(2) the nature of the evidence of his mental, emotional or physical condition which the defendant hospital required Dr. Runstrom to submit in each such instance.

(b) whether the defendant hospital *** [after any suspension] required Dr. Runstrom to submit to any medical, or psychiatric examinations, tests or treatments, and if so

(1) the dates upon which the defendant hospital required Dr. Runstrom to do so;

(2) the person or persons to whom Dr. Runstrom was required to submit himself for examinations, tests or treatments in each such instance;

(3) whether the defendant hospital required written reports to be made of the results of each such examination, test or treatment; and

(4) who chose the person or persons to whom Dr. Runstrom was required to submit himself for examinations, tests or treatment in each such instance."

Similarly to interrogatory No. 3, what plaintiffs requested in this interrogatory was not the end result of the peer review process but information regarding the workings of the process itself. The record establishes that disclosure of the information requested in interrogatory No. 4 would, if deemed appropriate, be requested and reviewed by the hospital's credentials committee either as part of the reappointment process or as a special investigation affecting the physician's privileges. As set forth in the affidavit of Dr. Robert Klint, chief executive officer of the hospital, evidence of the physical and mental health of a staff physician is something which may be required by the credentials committee in the context of reviewing a physician's competence and deciding whether to continue the physician's staff privileges. Moreover, this disclosure is specifically authorized by the hospital's bylaws as part of the reappointment process.

In *Mennes v. South Chicago Community Hospital* (1981), 100 Ill. App. 3d 1029, the plaintiffs alleged that the defendant hospital was negligent in failing to adequately check and review the qualifications of two of its staff physicians. Plaintiff sought discovery of materials regarding the granting of privileges and reappointment of the defendant physicians to the hospital's medical staff. The court held that despite plaintiffs' allegations of negligence in the credential and reap-

pointment process, such information was, nevertheless, protected by the Medical Studies Act. The court said:

"We agree with defendant hospital's contention that if all staff appointment material could be obtained and used against the hospital whenever a patient urged a negligent staff appointment theory, the statutory goal of candid commentary would be compromised.

\* \* \*

We will not subject hospital staff review committees to the ever impending threat of public or judicial scrutiny under the auspices of the discovery process. For us to rule otherwise would gravely hamper the effectiveness of such committees as well as defeat the legislative intent in this area." 100 Ill. App. 3d at 1031-32.

Plaintiffs here seek to discover information relied upon by the hospital in reviewing Dr. Runstrom's privileges and competency to practice medicine at the hospital. This is precisely the type of information the *Mennes* court determined the Act was designed to protect from public disclosure. We believe *Mennes* correctly states Illinois law and, therefore, find that the trial court's ruling requiring the hospital in the instant case to produce the protected information in question had the effect of rendering the Act meaningless. We conclude that the court erred in ordering the hospital to answer plaintiffs' interrogatory Nos. 3 and 4.

Furthermore, we find that the information requested in interrogatory No. 4, as well as interrogatory No. 6, was privileged under the Mental Health and Developmental Disabilities Confidentiality Act. (Ill. Rev. Stat. 1987, ch. 91½, par. 801 *et seq.*) Plaintiffs' interrogatory No. 4 has been set out above. Interrogatory No. 6 requested the hospital to disclose:

"(a) on how many occasions Richard Runstrom was a patient at SwedishAmerican Hospital;

(b) on what specific dates was Richard Runstrom a patient at SwedishAmerican Hospital;

(c) on each occasion, was Richard Runstrom admitted as an in-patient, or treated on an out-patient basis;

(d) on each such occasion, who was the admitting or principal treating physician;

(e) on each such occasion, what was the admitting or original diagnosis and what was the discharge or final diagnosis; and

(f) on each such occasion, what was the nature of all exami-

nations, tests or treatment rendered."

The hospital answered this interrogatory in part, stating that Dr. Runstrom was admitted as an inpatient in 1971, 1972, and 1973. The hospital refused to disclose the identity of the attending physician on each occasion as well as the diagnoses and the nature of examinations, tests, or treatments rendered, as such information fell within the scope of the Mental Health and Developmental Disabilities Confidentiality Act (the Act) (Ill. Rev. Stat. 1987, ch. 91½, par. 801 *et seq.*).

The Mental Health and Developmental Disabilities Confidentiality Act provides that "[a]ll records and communications shall be confidential and shall not be disclosed except as provided in this Act." (Ill. Rev. Stat. 1987, ch. 91½, par. 803.) The "records" and "communications" made confidential under the Act refer to any communication made during or in connection with providing mental health or developmental disability services, any record kept in the course of providing such services, and any information which indicates that a person is a "recipient." (Ill. Rev. Stat. 1987, ch. 91½, par. 802(1), (7).) "Mental health or developmental disabilities services" include "examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation." (Ill. Rev. Stat. 1987, ch. 91½, par. 802(3).) A "recipient" is defined as a "person who is receiving or has received mental health or developmental disabilities services." (Ill. Rev. Stat. 1987, ch. 91½, par. 802(6).) The exceptions to the Act, allowing disclosure by court order, are very narrow, and none of them apply here. Ill. Rev. Stat. 1987, ch. 91½, par. 810.

To meet the avowed statutory purpose of protecting the confidentiality of the records and communications of those receiving mental health services, the Act is premised on a general prohibition against the disclosure of such information, except where specifically provided for in the Act. (*People v. Foskey* (1988), 175 Ill. App. 3d 638, 644; *Laurent v. Brelji* (1979), 74 Ill. App. 3d 214, 216.) The general prohibition against disclosure of recipient records and communications was enacted because:

> "Presumably, the patient in psychotherapeutic treatment reveals the most private and secret aspects of his mind and soul. To casually allow public disclosure of such would desecrate any notion of an individual's right to privacy. At the same time, confidentiality is essential to the treatment process itself, which can be truly effective only when there is complete candor and revelation by the patient. Finally, confidentiality provides proper assurances and inducement for persons who need treatment to seek it." (74 Ill. App. 3d at 217.)

Nevertheless, the legislature recognized the existence of countervailing societal needs which demand disclosure in certain instances by creating nine exceptions to the nondisclosure mandate.

■■■ In the instant case, as the hospital points out, plaintiffs' interrogatory Nos. 4 and 6 sought information which was privileged under the Act. In interrogatory No. 4 plaintiffs asked whether Dr. Runstrom had been required by the hospital to undergo psychiatric examinations, tests, or treatments, and, if so, what physician he saw and whether any records of such examinations, tests, or treatments were kept. This interrogatory required disclosure of whether Dr. Runstrom was a recipient of mental health services, information which is clearly privileged under the Act. Interrogatory No. 6, by its breadth, went even further, requiring specific information regarding Dr. Runstrom's treating physicians and the mental health diagnosis, tests, and treatments rendered to the doctor.

Moreover, none of the statutory exceptions to the nondisclosure mandate applied in the instant case to permit disclosure. Section 10(a)(1) of the Act governs disclosure in civil actions and provides:

> "Records and communications may be disclosed in a civil, criminal or administrative proceeding in which the recipient introduces his mental condition or any aspect of his services received for such condition as an element of his claim or defense ***." (Ill. Rev. Stat. 1987, ch. 91½, par. 810(a)(1).)

Thus, the privilege against disclosure of communications between patient and therapist can only be waived expressly or affirmatively by placing in issue one's own mental condition. (*Bland v. Department of Children & Family Services* (1986), 141 Ill. App. 3d 818, 826.) Such is not the case here where plaintiffs, rather than the "recipient," Dr. Runstrom, have attempted to place the doctor's mental condition in issue.

We conclude that the information sought in plaintiffs' interrogatory Nos. 4 and 6 dealing with Dr. Runstrom's mental condition was privileged and not discoverable under the terms of the Act and that, therefore, the trial court erred in compelling disclosure of this information.

Further, the physician-patient privilege (Ill. Rev. Stat. 1987, ch. 110, par. 8—802) prohibited disclosure of the confidential medical information sought in interrogatory Nos. 4 and 6. The interrogatories in question requested disclosure of information regarding the nature of the medical evaluations performed on Dr. Runstrom and specific information regarding diagnosis, examinations, tests, or treatment rendered.

The physician-patient privilege provides in relevant part:

"No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve such patient ***." (Ill. Rev. Stat. 1987, ch. 110, par. 8—802.)

This privilege exists as to "any information" acquired by a physician in a professional capacity which is "necessary" to enable him to "serve" his patient. (*Geisberger v. Willuhn* (1979), 72 Ill. App. 3d 435, 437.) In creating the physician-patient privilege, the legislature recognizes that patients have a right to be free from the embarrassment and invasion of privacy that often accompany the disclosure of medical information. (*Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 602-03.) Nevertheless, the statute contains several exceptions wherein the legislature determined that the protection afforded by the physician-patient privilege should give way to the public's desire to ascertain the truth. (148 Ill. App. 3d at 603.) None of the statutory exceptions apply to the case at bar.

Of the exceptions set forth in the statute, only three pertain to civil actions of the nature brought here. (Ill. Rev. Stat. 1987, ch. 110, pars. 8—802(2), (3), (4).) Section 8—802(2) provides that a patient's medical information is discoverable "in actions, civil or criminal, against the physician for malpractice." (Ill. Rev. Stat. 1987, ch. 110, par. 8—802(2).) This exception, however, is "limited to only allow the disclosure of the records of the patient who is bringing the malpractice action." (*Parkson v. Central Du Page Hospital* (1982), 105 Ill. App. 3d 850, 855; see also *Petrillo*, 148 Ill. App. 3d at 603.) Since the medical records of plaintiff Linnea Pritchard are not sought to be disclosed, this exception does not apply to the instant case.

Likewise, neither exception (3) nor exception (4) applies to allow disclosure here. These exceptions provide that disclosure of confidential medical information is allowed "with the expressed consent of the patient" (Ill. Rev. Stat. 1987, ch. 110, par. 8—802(3)), and "in all actions brought by or against the patient, *** wherein the patient's physical or mental condition is an issue." (Ill. Rev. Stat. 1987, ch. 110, par. 8—802(4).) As the hospital correctly points out, the plaintiffs do not contend that Dr. Runstrom or his estate has expressly consented to disclosure of confidential medical information pertaining to him and, thus, exception (3) cannot apply in this case.

On the other hand, plaintiffs do contend that medical information pertaining to Dr. Runstrom is discoverable under exception (4) since his physical condition has been placed in issue by virtue of plaintiffs'

complaint. However, plaintiffs ignore the fact that for this exception to apply, the patient, Dr. Runstrom, rather than plaintiffs, must have affirmatively placed his physical condition in issue. (See *Petrillo,* 148 Ill. App. 3d at 603.) Here, Dr. Runstrom has not affirmatively placed his condition in issue and, therefore, has not consented to the disclosure of this confidential medical information. Since none of the statutory exceptions to the physician-patient privilege apply in the case at bar, we find that the medical information sought by the plaintiffs fell within the scope of the physician-patient privilege and that the trial court erred in requiring its disclosure.

In light of our findings above, we find it unnecessary to discuss the hospital's final issue that the interrogatories were overly broad and sought irrelevant information.

For all the foregoing reasons, the Winnebago County circuit court's order compelling defendant hospital to disclose the information requested in the interrogatories in question and the contempt order imposing a sanction for failure to do so are reversed, and the cause is remanded for further proceedings consistent with this disposition.

Reversed and remanded.

DUNN and McLAREN, JJ., concur.