MARIA ZAJAC, Plaintiff-Appellant, v. ST. MARY OF NAZARETH HOSPITAL CENTER, Defendant-Appellee.

First District (1st Division) No. 1—88—1932

Opinion filed April 8, 1991.

Law Offices of Jeffrey M. Marks and David A. Novoselsky & Associates, both of Chicago (Peter F. Zullo, David A. Novoselsky, and Kathleen M. Krist, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (E. Michael Kelly, Kevin J. Burke and Nancy G. Lischer, of counsel), for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Plaintiff, Maria Zajac, initially brought this action against defendants, St. Mary of Nazareth Hospital Center (hereinafter St. Mary's Hospital), Dr. Mohammed Sirajullah and Dr. Timothy Watson, alleging medical malpractice. On January 22, 1988, prior to trial on this matter, a settlement was reached between Dr. Sirajullah and plaintiff for $900,000. Thereafter, Dr. Sirajullah was dismissed with prejudice. Dr. Watson was also dismissed as a party defendant, since he was never served, and the trial proceeded solely against St. Mary's Hospital on a theory that the hospital had been negligent by its failure to review and monitor the treatment provided by Dr. Sirajullah. On March 24, 1988, the jury returned a verdict in favor of the defendant. Thereafter, the trial court entered a judgment on the jury's verdict and denied plaintiff's post-trial motion for a new trial. Plaintiff appeals the jury's verdict, contending that: (1) the trial court erred in precluding plaintiff's expert from testifying regarding the hospital review procedures and bylaws; (2) Dr. Sirajullah should have been treated as an adverse witness; (3) the course of treatment rendered by Dr. Sirajullah at St. Mary's Hospital was relevant to establish the hospital's duty to review and supervise the medical care administered to a patient; and (4) the trial court erred in precluding Dr. Landon's additional expert opinion.

On June 21, 1985, Maria Zajac, plaintiff, 65 years old at the time of trial, filed a medical malpractice complaint against Dr. Sirajullah, Dr. Watson and St. Mary's Hospital. The complaint alleged that between November 19, 1982, and September 4, 1984, plaintiff was treated by Dr. Mohammed Sirajullah and Dr. Timothy Watson at St. Mary's Hospital for an arthritic problem with her right knee. During surgery performed on the knee, Dr. Sirajullah and Dr. Watson unnecessarily removed an additional one-half inch of plaintiff's femur while

preparing the knee for an insertion of a prosthesis device. Over the next two years following the surgery, plaintiff suffered from infection problems. In 1984 plaintiff transferred to Rush-Presbyterian-St. Luke's Hospital for further treatment. The complaint further alleges an agency relationship between the hospital, Dr. Sirajullah, and Dr. Watson, contending that the hospital was negligent by its failure "to provide adequate personnel in the operating room; to examine the plaintiff; to order proper tests of the plaintiff; to provide a non-defective prosthetic device; to properly treat the plaintiff; and to advise the plaintiff of the hospital's negligence." Plaintiff also alleged that as a proximate cause of defendant's alleged negligent conduct, plaintiff has suffered from many injuries, including a shortening of her leg, necrosis of the leg due to inadequate blood supply, bone grafts, skin grafts and infections. Additionally, there is a possibility that plaintiff's right leg will have to be amputated. The record discloses that the following evidence was adduced at trial.

Henry Pachura, plaintiff's son-in-law, testified that on April 4, 1983, after discovering that the plaintiff was very ill, he called an ambulance and accompanied her to St. Mary's Hospital. On April 14, 1983, Mr. Pachura sought help for the plaintiff through the hospital administration by informing Mr. Ulaszek, vice-president of administration, that he was worried about the decisions being made in regards to the plaintiff, who was scheduled to be operated on that morning. Mr. Ulaszek consulted with Dr. Robert Swastek, head of internal affairs, who assured Mr. Pachura that they would look into the matter. Mr. Pachura testified that he relied on Mr. Ulaszek's representation that the matter would be taken care of and did not complain any further.

Barbara Pachura, plaintiff's daughter, testified that prior to the time that plaintiff experienced problems with her knee in 1979, she was very mobile and self-sufficient. She further testified that prior to surgery, Dr. Sirajullah advised plaintiff that the only alternative was a total knee replacement, which carried certain risks. After knee surgery in 1982, plaintiff experienced pain when she walked and became limited in the things that she could do. Ms. Pachura testified that she inquired after the April 14, 1983, surgery as to "why there were so many surgeries in a short period of time." Dr. Watson told her that the hospital environment was one possibility. Ms. Pachura further testified that she asked in April 1983 whether another doctor could be assigned to plaintiff's case and was told by Dr. Swastek that Dr. Sirajullah is a competent doctor. Ms. Pachura testified that in April 1983, her mother developed boils on her leg and her condition did not improve until she

began getting medical help at Rush-Presbyterian-St. Luke's Hospital. Plaintiff's medical bills at St. Mary's Hospital totaled $214,269.71.

Dr. Steven Gitelis testified that he is a board-certified orthopedic surgeon who treated plaintiff in 1984 when she came to Rush-Presbyterian-St. Luke's Medical Center from St. Mary's Hospital with an infected total knee arthroplasty. He testified in his capacity, not as plaintiff's expert witness, but as plaintiff's treating physician at Rush-Presbyterian-St. Luke's Medical Center, stating that the long-term result of the use of the type of prosthesis plaintiff had was a higher incidence of infection. Dr. Gitelis stated that prophylactic antibiotics should be used when a surgeon puts in a hinged prosthesis and there is a need to revise the patella. The prophylactic antibiotic was not used in this case. Dr. Gitelis testified that the development of infection is a known complication of total knee replacement.

Dr. Glen Landon testified that he is a board-certified orthopedic surgeon at Rush-Presbyterian-St. Luke's Hospital and he treated the plaintiff after her treatment at St. Mary's Hospital. Dr. Landon testified that the hinge prosthesis used on the plaintiff was identified with numerous risks and problems. It is disfavored due to mechanical problems, and this type of prosthesis is only used in exceptional cases where a patient has tumors or a large amount of bone removed. The prosthesis has been replaced by codylar types which utilize the patient's own ligaments to stabilize the knee. Dr. Landon testified that, based on a reasonable degree of medical certainty, in his opinion, St. Mary's Hospital deviated from acceptable standards of hospital practice while plaintiff was being treated in its facility. Moreover, when the family of the plaintiff went to the hospital administration requesting an investigation of plaintiff's knee replacement, the hospital incorrectly reassured the family that everything was fine. He stated that the plaintiff had developed a bad infection in her knee and she did not receive proper antibiotic treatment or proper treatment in general. He further stated that Dr. Pelicore deviated from the standard of care by his failure to conduct a thorough investigation of plaintiff's care. Moreover, Dr. Pelicore should have reviewed the plaintiff's chart, X rays, and her culture reports. Dr. Landon acknowledged that the type of prosthesis device used was a decision made solely by Dr. Sirajullah. Also, the decisions regarding the antibiotic management and post-operative management of the plaintiff were judgment calls made by Dr. Sirajullah. Dr. Landon stated that every surgeon who operates can have complications such as post-operative infection.

Dr. Henry Danko, an internal medicine doctor at Rush-Presbyterian-St. Luke's Hospital, was asked by Dr. Landon to be a consultant

on the plaintiff's case when she first arrived at the hospital. Dr. Danko testified that plaintiff's infection could have happened "at any time to any patient to any doctor," but he disagreed with Dr. Sirajullah's choice of antibiotics. He further testified that, with a reasonable degree of medical certainty, it was his opinion that the severity of plaintiff's condition in September 1984 was caused by her infection being improperly approached prior to her admittance to Rush-Presbyterian-St. Luke's Hospital.

Dr. Raymond Pelicore, chairman of the department of orthopedics and an expert witness for St. Mary's Hospital, testified that he served on several of the hospital committees and on April 14, 1983, he was called upon to investigate a concern expressed by plaintiff's family regarding plaintiff's care. Dr. Pelicore testified that as a physician on staff and department head at St. Mary's Hospital, he was familiar with the hospital's bylaws. Additionally, as chairman of the department of orthopedics, he was responsible for overseeing the overall practice of orthopedics, including reviewing charts, conducting monthly meetings and discussing cases. The cases to be discussed included new infection cases similar to the plaintiff's case. Dr. Pelicore stated that monthly meetings were held with members of the hospital's medical executive committee, which was comprised of department heads. These meetings addressed the medical treatment of all patients and provided an opportunity to discuss morbidity and mortality or an opportunity for anyone to discuss problem cases or ask advice. A patient or family's complaint could also be discussed at the monthly meetings.

Dr. Pelicore testified that he was responsible for looking into complaints made about patient treatment to the hospital administration. If the family continued to complain about a problem after the problem had been looked into by Dr. Pelicore, he would take the complaint to another doctor for review. A report would be written and submitted to the hospital committee for a consensus of opinion and if significant he would submit it to the hospital administration. In a life-threatening situation, the hospital would become responsible to the patient. Dr. Pelicore described the patient-care audit procedure which analyzed whether the care received deviated from the normal. He further testified that he consulted with Dr. Sirajullah in his capacity as a private physician, not as the chairman of the orthopedics department. Dr. Pelicore testified that in plaintiff's case, both leaving the prosthesis in and removing the prosthesis posed great risk. However, when the family questioned Dr. Sirajullah's treatment in April, it was Dr. Pelicore's opinion that the treatment was correct.

Dr. Mohammed Sirajullah testified that he is an attending physician with consulting privileges at St. Mary's Hospital. In 1982, he was the treating physician who performed the total knee replacement surgery on the plaintiff and placed an "offset hinge prosthesis" in plaintiff's knee during the operation. Prior to performing surgery on the plaintiff he explained the risks of such surgery, including the loosening of the prosthesis and infection. In March 1983, he removed two-thirds of plaintiff's knee, and in April 1983, he removed "unwanted material" from plaintiff's knee due to the development of an infection after surgery. Dr. Sirajullah testified that he did not remember anyone from the administration reviewing his care of plaintiff. He did, however, recall that Dr. Pelicore had questioned him about the surgery for a minute or two.

Dr. Sirajullah testified that he saw the plaintiff on several occasions regarding treatment for her infections. On October 31, 1983, plaintiff was admitted to the hospital, and on December 12, 1983, Dr. Sirajullah noted that plaintiff had a chronic infection of which he informed the family. By January 7, 1984, plaintiff's surgical wound had healed. However, by the end of February plaintiff had developed another flare-up of the infection. Dr. Sirajullah noted that a month later the wound was healed. On May 2, 1984, an infection had developed in a different location. Dr. Sirajullah prescribed another antibiotic and told plaintiff to return in one week. Instead, plaintiff returned in six weeks. X rays were taken of the plaintiff's knee, and the X rays showed that the prosthesis was protruding and by August 1, 1984, the prosthesis was loose. On that same date, after several additional flare-ups of the infection, an orthopedic conference was held at St. Mary's Hospital to discuss plaintiff's case. The consensus was "to remove the prosthesis, and set up the irrigation system in an attempt to kill the infection." Dr. Sirajullah stated that it was his decision as to how much bone was to be removed during surgery on the plaintiff and which prosthesis to use. Dr. Sirajullah further stated that throughout plaintiff's care, she was advised of all options and accepted Dr. Sirajullah's treatment. However, the final decisions were made by the plaintiff. He testified that as an independent staff physician, he is required to follow hospital rules, regulations, and bylaws. Dr. Sirajullah further testified that it is the doctor's responsibility, not the hospitals', to make all decisions regarding the patient's treatment and care.

Dr. Robert Swastek testified that between 1982 and 1984 he was the vice-president of medical affairs at St. Mary's Hospital. In that capacity he served as a liaison between the medical staff and the administration. He stated that in 1983, he conducted a review of plaintiff's

care when the family expressed concern about the surgical procedure she was about to undergo. Dr. Swastek consulted with Mr. Ulaszek, an administration representative, and subsequently discussed the family's concerns with Dr. Pelicore, chief of orthopedic service. Dr. Swastek stated that Dr. Pelicore was a member of the staff of St. Mary's Hospital medical staff and received a minor salary. Dr. Swastek further testified that the family only expressed their concern about the surgical procedure. They did not present their question as a complaint against the attending physician. If a complaint had been made against Dr. Sirajullah, a formal investigation would have been conducted.

Dr. Dennis Gates, a board-certified orthopedic surgeon and an expert witness for St. Mary's Hospital, testified that in 1982 the plaintiff was a candidate for full knee replacement. He stated that it is the orthopedic surgeon performing a full knee replacement who decides what type of prosthetic device should be used. About 1 of 20 total knee replacements results in infection, and surgeons can disagree on the course of treatment for patient care. In his opinion, the closed suction, irrigation, and antibiotic management of plaintiff on April 14, 1983, was reasonable and appropriate. Moreover, he opined that, based upon a reasonable degree of medical certainty, St. Mary's Hospital complied with the standard of care for hospitals when it provided care to the plaintiff. Dr. Gates testified that a surgeon is totally independent from the hospital which grants a surgeon the privilege of practicing there. Moreover, the chairman of the department is administratively responsible for overseeing the department but has no authority over the decisions of independent doctors. Dr. Gates stated that there was nothing that the hospital did which resulted in harm to the patient.

Plaintiff initially argues on appeal that the trial court erred in precluding plaintiff's expert from testifying regarding the hospital's review procedures and bylaws. Defendant argues that the trial court correctly ruled on the scope of testimony and the matters at issue. We agree with the defendant. The information sought to be discovered by plaintiff is protected by section 8—2101 of the Code of Civil Procedure (the Medical Studies Act or Act) (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101). Defendant correctly argues that evidence regarding a hospital's review procedures is not admissible under the Medical Studies Act, which provides in pertinent part:

> "All information, interviews, reports, statements, memoranda or other data of the *** committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive

Committees *** used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care, shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges, except that in any hospital proceeding to decide upon a physician's staff privileges, or in any judicial review thereof, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based." Ill. Rev. Stat. 1987, ch. 110, par. 8—2101.

■■■ The purpose of the Medical Studies Act is to make certain kinds of material confidential and nondiscoverable in order to encourage candid and voluntary studies and programs which are used to improve patient care and hospital conditions or used to reduce the rate of death and disease. (*Niven v. Siqueira* (1985), 109 Ill. 2d 357, 366, 487 N.E.2d 937.) Therefore, any materials in the possession of a hospital used as a part of a program or study designed to improve quality control, patient care or to reduce morbidity or mortality are protected by the Act. (*Niven*, 109 Ill. 2d at 366.) Moreover, both the discovery and use of such confidential information are prohibited under the Act (Ill. Rev. Stat. 1987, ch. 110, par. 8—2102), and the improper disclosure of such information constitutes a Class A misdemeanor. (Ill. Rev. Stat. 1987, ch. 110, par. 8—2105.) A further purpose of the Act " 'is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care.' " *Pritchard v. SwedishAmerican Hospital* (1989), 191 Ill. App. 3d 388, 397, 547 N.E.2d 1279, quoting *Jenkins v. Wu* (1984), 102 Ill. 2d 468, 480, 468 N.E.2d 1162.

■■■ Plaintiff asserts that the trial court's ruling prohibited counsel from presenting evidence and expert testimony that would establish that the bylaws of St. Mary's Hospital required: "(1) a mortality and morbidity review; (2) a monthly peer review committee meeting; (3) a patient care audit; and (4) an infection control mechanism meeting and these deviations proximately caused plaintiff's injuries." However, the nature and content of an internal review process are privileged and confidential information. (*Pritchard*, 191 Ill. App. 3d at 399.) Moreover, the trial court is granted broad discretion regarding the admission of evidence, and its decision will not be reversed on appeal unless that discretion has been clearly abused. *Greene v. Rogers* (1986), 147 Ill. App. 3d 1009, 1018, 498 N.E.2d 867; *In re Estate of Weir* (1983), 120 Ill. App. 3d 18, 458 N.E.2d 134.

■ In the present case, the hospital review procedures were used for internal quality control, to improve patient care and to reduce mortality and morbidity by conducting reviews and studies. In order to determine whether the hospital properly conducted a review of Dr. Sirajullah and thereby followed its review procedures, it would be necessary to obtain information on the content of the review procedures which falls within the scope of information protected by section 8—2101 of the Medical Studies Act. The plain language of the Medical Studies Act expressly protects all information obtained by the patient care audit committee or the medical care evaluation committee used in the course of internal quality control or for the purpose of improving patient care and such information shall be privileged and confidential. (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101.) To allow discovery of such information would contravene the statutory prohibition. "We will not subject hospital staff review committees to the ever impending threat of public or judicial scrutiny under the auspices of the discovery process. For us to rule otherwise would gravely hamper the effectiveness of such committees as well as defeat the legislative intent in this area." *Mennes v. South Chicago Community Hospital* (1981), 100 Ill. App. 3d 1029, 1031-32, 427 N.E.2d 952.

■ Plaintiff further argues that defendant waived its right to raise the Medical Studies Act privilege at trial by its failure to object to this evidence during Dr. Pelicore's evidence deposition testimony. The privilege set forth in the Act cannot be waived. To the contrary, criminal penalties are imposed for the disclosure of such privileged information. (See *Sakosko v. Memorial Hospital* (1988), 167 Ill. App. 3d 842, 845, 522 N.E.2d 273.) Section 8—2102 provides:

"Admissibility as evidence. Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind *in any court* or before any tribunal, board, agency or person. The disclosure of any such information or data, whether proper, or improper, *shall not waive* or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 110, par. 8—2102.)

Even if the trial court would have erroneously granted plaintiff's request regarding the hospital's review procedures, evidence retains its confidential and privileged status whether or not it has been properly or improperly disclosed. (Ill. Rev. Stat. 1987, ch. 110, par. 8—2102; *Sakosko*, 167 Ill. App. 3d at 846.) Moreover, the record does not reveal that plaintiff raised the issue in her complaint regarding whether the hospital was negligent based on a violation of its review procedures

pursuant to its bylaws. Instead, the issue pleaded in the amended complaint was that the hospital was liable under an agency theory for the improper care and treatment of the plaintiff. It is well established that plaintiff cannot plead one cause of action in her complaint and during trial attempt to prove another cause of action. (*Greene*, 147 Ill. App. 3d at 1021; *Curry v. Summer* (1985), 136 Ill. App. 3d 468, 480, 483 N.E.2d 711.) In any event, we believe that the hospital's review procedures are protected by the Medical Studies Act. Thus, the trial court did not abuse its discretion in disallowing evidence pertaining to the hospital's review procedures.

■ Plaintiff next argues that the trial court erred in its refusal to allow plaintiff to cross-examine Dr. Sirajullah, a former party to the action, as an adverse witness. Whether to allow a witness to be treated as a hostile witness is within the discretion of the trial court. (*People v. Pittman* (1973), 55 Ill. 2d 39, 59, 302 N.E.2d 7; *Mazzone v. Holmes* (1990), 197 Ill. App. 3d 886, 896, 557 N.E.2d 186.) Section 2—1102 (Ill. Rev. Stat. 1987, ch. 110, par. 2—1102) provides in pertinent part:

> "Examination of adverse party or agent. Upon the trial of any case any party thereto or any person for whose immediate benefit the action is prosecuted or defended, or the officers, directors, managing agents or foreman of any party to the action, may be called and examined as if under cross-examination at the instance of any adverse party. The party calling for the examination is not concluded thereby but may rebut the testimony thus given by counter testimony and may impeach the witness by proof of prior inconsistent statements."

■ It should be noted that dismissal of a party from a suit terminates any interest that party may have in the suit. (*Cummings v. Chicago Transit Authority* (1980), 86 Ill. App. 3d 914, 920, 408 N.E.2d 737.) In the present case, Dr. Sirajullah was dismissed from this cause of action with prejudice. As a result of that dismissal, his interest in the action was also terminated. Therefore, Dr. Sirajullah was not a party to the action before the court. Moreover, the action was not brought for the benefit of Dr. Sirajullah, nor does the record reveal that he was serving as an officer, director, managing agent or foreman of St. Mary's Hospital. Actually, the record does not reveal that he served in any supervisory capacity with St. Mary's Hospital. Consequently, since Dr. Sirajullah did not fall under any of the categories set forth in section 2—1102, plaintiff was not automatically entitled to examine Dr. Sirajullah as if under cross-examination. However, Supreme Court Rule 238 (107 Ill. 2d R. 238(b)) provides that: "If the court determines that a witness is hostile or unwilling, he may be examined by

the party calling him as if under cross-examination." It is well established that Rule 238 only applies to witnesses who prove to be hostile, uncooperative, or unwilling *while on the witness stand*. (*Mazzone,* 197 Ill. App. 3d at 896; *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 926-27, 419 N.E.2d 578.) In the present case, the record reveals that plaintiff requested permission to examine Dr. Sirajullah as an adverse witness in a motion *in limine* prior to the commencement of trial. The record does not disclose that the trial court determined that Dr. Sirajullah was a hostile or unwilling witness while on the witness stand. Furthermore, the fact that Dr. Sirajullah may have given testimony unfavorable to the plaintiff is insufficient to invoke the provisions of Rule 238. (*Mazzone,* 197 Ill. App. 3d at 896-97; *Jensen,* 94 Ill. App. 3d at 926.) We, therefore, conclude that the trial court did not abuse its discretion in denying plaintiff's request to cross-examine Dr. Sirajullah as an adverse witness.

 Plaintiff next contends that the trial court erred in its ruling absolving St. Mary's Hospital of its responsibility for Dr. Sirajullah's performance of his duties since plaintiff maintains that a hospital may be liable for a physician's conduct under a *respondeat superior* theory. Specifically, plaintiff argues that the hospital has a continuing duty to supervise the medical care administered to a patient. It is well settled that a hospital may be liable for injuries suffered by a patient in its care where: (1) under a *respondeat superior* theory there exists an employer-employee or principal-agent relationship between the hospital and the physician; and (2) the hospital may owe an independent duty to supervise and review the medical care administered to the patient. *Alford v. Phipps* (1988), 169 Ill. App. 3d 845, 857, 523 N.E.2d 563; *Reynolds v. Mennonite Hospital* (1988), 168 Ill. App. 3d 575, 578, 522 N.E.2d 827; *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204.

 █ At trial, plaintiff premised the hospital's liability on a theory of vicarious liability based on the hospital's alleged negligence in its failure to review and monitor Dr. Sirajullah's treatment. A hospital is not an insurer of a patient's safety, but a hospital does owe the patient a duty of protection, and it must exercise a degree of reasonable care toward the patient as his or her known condition requires. (*Alford,* 169 Ill. App. 3d at 857; *Pickle v. Curns* (1982), 106 Ill. App. 3d 734, 739, 435 N.E.2d 877.) However, a hospital does not have an independent duty to insure that each of its staff physicians will always perform his duty of due care to the patient. (*Alford,* 169 Ill. App. 3d at 858; *Reynolds,* 168 Ill. App. 3d at 579; *Barton v. Evanston Hospital*

(1987), 159 Ill. App. 3d 970, 973, 513 N.E.2d 65.) Moreover, the manner in which to treat a patient is a medical decision solely within the discretion of the treating physician, not the hospital. (*Alford*, 169 Ill. App. 3d at 857-58; *Johnson v. St. Bernard Hospital* (1979), 79 Ill. App. 3d 709, 714, 399 N.E.2d 198.) It has been further determined that the negligence of a physician in treating a patient cannot be imputed to the hospital in instances where the physician is not an agent or under the direction of the hospital. (*Johnson*, 79 Ill. App. 3d at 714.) Illinois courts have also traditionally concluded that a hospital is not liable for the acts of an individual who renders medical care as an independent agent beyond the control of the hospital. *Alford*, 169 Ill. App. 3d at 858; *Hundt v. Proctor Community Hospital* (1972), 5 Ill. App. 3d 987, 284 N.E.2d 676.

 Plaintiff asserts that, if the hospital would have used its normal procedures of review, then it would have discovered that the treating physician was using a type of prosthesis which was no longer used except for a few special patients. However, " 'a hospital will not be held liable for an act of malpractice performed by an independently retained healer unless it had reason to know the act of malpractice would take place ***.' " (*Reynolds*, 168 Ill. App. 3d at 579, quoting *Pickle v. Curns* (1982), 106 Ill. App. 3d 734, 739.) In the instant case, the record does not establish that the hospital had reason to know that Dr. Sirajullah would commit the alleged malpractice.

Dr. Sirajullah testified that he was an independent staff physician with consulting privileges at St. Mary's Hospital, and it is the doctor's, not the hospital's, responsibility to make all decisions regarding patient treatment and care. Dr. Dennis Gates, a board-certified orthopedic surgeon, testified that a surgeon is totally independent of the hospital and that St. Mary's Hospital had complied within a reasonable degree of medical certainty with the standard of care for hospitals when it provided care to the plaintiff. Dr. Landon, plaintiff's expert witness, testified that the type of prosthesis device used was a decision made solely by Dr. Sirajullah. He further testified that infection is a complication that every surgeon who operates may have. Moreover, Dr. Danko testified that plaintiff's infection could have happened "at any time to any patient to any doctor." Finally, Dr. Pelicore, chairman of the department of orthopedics and responsible for reviewing complaints made to the hospital administration regarding patient treatment, opined that the treatment rendered by Dr. Sirajullah was correct.

 Since the manner in which plaintiff was treated in the instant case was a medical decision solely within the discretion of Dr. Sirajul-

lah, we are of the opinion that the evidence does not establish that the hospital had control over Dr. Sirajullah's performance relative to plaintiff's total knee replacement. The absence of control over the decisions of Dr. Sirajullah establishes an independent relationship between Dr. Sirajullah and the hospital. Although plaintiff asserts that the hospital, through its agent, Dr. Sirajullah, was negligent, the record does not support the existence of an agency relationship. Instead, the evidence established that Dr. Sirajullah was an independent physician, responsible for making all decisions regarding the plaintiff's medical treatment. Therefore, we conclude that, under the facts of this case, the trial court correctly determined that the hospital was not liable for Dr. Sirajullah's course of treatment for the plaintiff.

■■■ Plaintiff finally argues that she was denied a fair and impartial trial when the trial court precluded Dr. Landon, plaintiff's expert witness, from giving an additional opinion at trial as to whether the hospital nursing staff also deviated from the acceptable standard of care in light of Dr. Pelicore's evidence deposition that was taken in West Palm Beach, Florida, just prior to trial. It should, however, be noted that plaintiff acknowledged in her appellate brief that Dr. Landon's testimony actually covered the additional opinion which plaintiff sought to have expressed at trial pertaining to the hospital nursing staff. A party cannot complain of evidence being excluded where the same evidence is admitted. *Tomaszewski v. Godbole* (1988), 174 Ill. App. 3d 629, 637, 529 N.E.2d 260.

■■ Defendant contends that the trial court properly excluded Dr. Landon's additional opinion since it was not disclosed pursuant to Illinois Supreme Court Rule 220. Supreme Court Rule 220(c) requires the party retaining or employing an expert witness, to be called to testify at trial, to respond to written interrogatories by stating the subject matter on which the expert is expected to testify, the expert's conclusions, opinions and the bases thereof, and the expert's qualifications. (107 Ill. 2d R. 220(c)(1).) Rule 220 further requires the party retaining the expert to seasonably supplement the expert's answers to the interrogatories when additional information becomes known to the party or the party's counsel. (107 Ill. 2d R. 220 (c)(3).) Rule 220(b) specifically provides that failure to disclose the identity of experts and their opinions or the failure to comply with discovery in accordance with Rule 220 will result in the disqualification of the expert as a witness. (107 Ill. 2d R. 220(b)(1); *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 237, 529 N.E.2d 525.) However, whether the trial court imposes sanctions for discovery violations and disqualifies the expert as a witness is within the sound discretion of the trial court and that

decision will not be disturbed on review absent a clear showing of an abuse of that discretion. See *Scheibel v. Groeteka* (1989), 183 Ill. App. 3d 120, 143-44, 538 N.E.2d 1236; *Ramos v. Pyati* (1989), 179 Ill. App. 3d 214, 228, 534 N.E.2d 472; *Romano v. Bittner* (1987), 157 Ill. App. 3d 15, 34, 510 N.E.2d 924.

We have previously held that an expert's direct testimony at trial may not be inconsistent with, nor go beyond the fair scope of, the facts known or the opinions disclosed during discovery. (*Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 69, 540 N.E.2d 770.) The record in the instant case reveals that Rule 220 interrogatories were propounded to the plaintiff on September 24, 1986, requesting the identity of any expert witnesses and their opinions. Plaintiff responded to the Rule 220 interrogatories on November 18, 1986, stating that the experts' opinions and the bases for their opinions were disclosed in the experts' depositions. During the next 18 months prior to trial, plaintiff failed to supplement the opinions of her experts as required by Rule 220. The purpose of Rule 220 is to allow litigants to discover and rely upon the opinions of the experts retained by their adversaries. (107 Ill. 2d R. 220, Committee Comments; *Bart*, 185 Ill. App. 3d at 69.) Hence, an expert's testimony is restricted to the opinions expressed in the expert's deposition. Therefore, any opinion expressed by an expert in addition to any opinion expressed in his deposition was properly excluded. See *Ramos*, 179 Ill. App. 3d 214, 534 N.E.2d 472.

In the case at bar, the trial court allowed Dr. Landon to testify in accordance with his opinion expressed in his deposition. If Dr. Landon desired to express an additional opinion, he was required to supplement his deposition testimony prior to trial in accordance with Rule 220. We conclude that the trial court did not abuse its discretion in refusing to allow Dr. Landon to testify beyond the scope of his deposition testimony.

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.