LINNEA PRITCHARD *et al.*, Plaintiffs-Appellees, v. SWEDISHAMERICAN HOSPITAL *et al.*, Defendants-Appellants (Richard Runstrom *et al.*, Defendants-Appellees).

Second District   No. 2—89—0941

Opinion filed July 17, 1990.

Hugh C. Griffin and Nancy Shaw, both of Lord, Bissell & Brook, of Chicago, and Lord, Bissell & Brook and Frederic T. Brandt III, of Holmstrom & Green, both of Rockford (Jeffry S. Spears and Richard D. Gaines, of counsel), for appellants.

Herbert I. Greene, of Greene, Bowman, Flaherty & McCarty, of Rockford (William M. Flaherty, of counsel), for appellees Linnea Pritchard, Edward Pritchard, and W. Donald Jones.

Heyl, Royster, Voelker & Allen, of Peoria, and Douglas Pomatto and Kevin J. Luther, both of Heyl, Royster, Voelker & Allen, of Rockford (Karen L. Kendall, of counsel), for appellee Novella Schafer.

Dale F. Conde, of Conde, Stoner & Killoren, of Rockford (Robert A. Calgaro, of counsel), for appellee Richard Runstrom.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiffs, Linnea and Edward Pritchard, brought an action for medical malpractice in the circuit court of Winnebago County against defendants, SwedishAmerican Hospital (hospital), Dr. Richard Runstrom, Dr. W. Donald Jones, Dr. Novella A. Schafer, and Dr. Adrienne Butler. Plaintiffs voluntarily dismissed Dr. Jones from the action and entered into a settlement agreement with Dr. Schafer and Dr. Runstrom. The trial court found that the settlement agreement was entered into in good faith and discharged Schafer and Runstrom from liability for contribution pursuant to section 2(d) of the Contribution Among Joint Tortfeasors Act (Contribution Act) (Ill. Rev. Stat. 1987, ch. 70, par. 302(d)). Thereafter, the trial court denied the hospital's and Dr. Butler's motion for leave to file counterclaims for contribution against Schafer and Runstrom. Defendants hospital and Butler timely filed this appeal, contending that the trial court erred in finding that the settlement made was made in good faith. We affirm.

The record reveals that on July 3, 1985, Linnea and Edward Pritchard filed this medical malpractice action against SwedishAmerican Hospital and Dr. Runstrom. On March 5, 1986, plaintiffs filed an amended complaint adding Dr. Schafer and Dr. Jones as defendants. Dr. Butler was added as an additional defendant on April 28, 1986, by way of a second amended complaint. Numerous allegations of negligence were made against the defendant doctors regarding the care and treatment rendered to Linnea during her stay at the SwedishAmerican Hospital. Included among the allegations were the following: failure to order proper tests and treatment, failure to obtain proper consultations with specialists, inadequate monitoring of Linnea's condition, allowing Linnea to develop hyponatremia and central pontine myelinolysis, and negligent administration of hypertonic saline solutions instead of normal saline to correct Linnea's hyponatremia. Many of the same allegations were made against SwedishAmerican Hospital under a *respondeat superior* theory. Plaintiffs further alleged that the hospital negligently rendered hospital services, failed to intervene in Linnea Pritchard's care, and allowed Dr. Runstrom to maintain hospital privileges.

Plaintiffs maintain that as a consequence of the above-alleged negligence, Linnea has suffered serious injuries that have confined her to a nursing home since June 1984. The injuries include permanent brain damage leaving her unable to speak, swallow, move her extremities or care for any of her daily needs.

In developing their case, plaintiffs engaged in substantial written and deposition discovery. Through this discovery it was adduced that

Linnea Pritchard was admitted to SwedishAmerican on June 17, 1984, complaining of weakness in her left arm and leg, numbness, and other symptoms. At the time of her admittance, she had three provisional diagnoses: transient ischemic attack, irreparable bowel syndrome, and myeloproliferative disorder with platelets. Linnea's attending physician was Dr. Runstrom. Runstrom, a general practitioner, called in several consultants during Linnea's hospitalization, including Dr. Butler, a hematologist-oncologist.

On the evening of June 23, 1984, Linnea was vomiting and complaining that she could not swallow. Dr. Schafer, a general practitioner who was on call that evening, ordered Compazine for vomiting, aspirin, and a 5% glucose intravenous line (IV). Schafer testified that the IV was instituted in order to get a "line" into Linnea's vein. This was done as a preventive measure in case Linnea went into shock. Schafer explained that "[i]f someone gets into shock you can't get a vein easy so if you have a line in you can always switch your bags." Schafer testified that she did not anticipate the need for the IV to be for a very long period of time. Schafer stated that after she left the hospital that evening she did nothing to follow up on her care of Linnea as that was normally the responsibility of the attending physician, in this case, Dr. Runstrom. Schafer testified that the contact that she had with Linnea on June 23, 1984, was the only occasion on which Dr. Schafer ever saw Linnea or ordered treatment for her.

On June 24, 1984, Dr. Butler, the consulting hematologist-oncologist called in by Dr. Runstrom, reviewed Linnea's chart and indicated to Runstrom that she (Butler) "would no longer be following [Linnea] on a regular or daily basis but would be available in the event that there were some particular development or problem that he or anyone felt was within her area of specialty and expertise."

On June 28, 1984, Linnea was reportedly not "doing well in a general sense," so Dr. Runstrom called in Dr. Butler and ordered that electrolyte testing be done. The results of the tests indicated that Linnea's sodium level was "very low," and consequently, Dr. Butler instituted corrective therapy.

Plaintiff's expert, Dr. Stanley Goldfarb, who specializes in nephrology (i.e., the science that deals with the kidneys), testified that the condition of ill-being from which Linnea Pritchard ultimately suffered was central pontine myelinosis. Goldfarb stated that Linnea's condition was caused by either hyponatremia itself (i.e., deficiency of sodium in the blood) or the correction of hyponatremia. Goldfarb admitted that this is an area of significant dispute and disagreement among knowledgeable experts in the field of nephrology. Goldfarb

stated that it was impossible for him to say when the hyponatremia first existed in Linnea, but opined that it was at some point prior to June 28, 1984.

Goldfarb stated that he believed that any physician that was involved in the care of Linnea after the episode of nausea and vomiting and after the initiation of the IV fluids (*i.e.*, June 23, 1984) should have at least recommended that her electrolyte levels be checked. Specifically, Goldfarb criticized Dr. Schafer, Dr. Runstrom, and Dr. Butler. Goldfarb testified that Dr. Schafer had deviated from the standard of care by instituting the IV on June 23, 1984, without also ordering electrolyte testing. Plaintiff's theory was that when the particular type of IV fluid that was used here is given, the patient's sodium level is diluted. Therefore, a physician who orders such an IV should never do so without first checking the patient's salt level in the blood.

According to Goldfarb, Dr. Runstrom's "failure to monitor the patient's fluid and electrolyte status properly" also constituted a departure from the standard of care. Goldfarb further testified that Dr. Butler deviated from the standard of care on June 24, 1984, by not recommending that Linnea have electrolyte testing done after Butler had reviewed Linnea's chart, which indicated that the previous day Linnea was nauseated and vomiting, and IV fluids had been started without any notation as to what her electrolytes were.

The record reveals that on June 4, 1987, plaintiff voluntarily dismissed defendant Dr. W. Donald Jones from the lawsuit pursuant to section 2—1009 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1009). The record does not indicate the alleged part Dr. Jones played in the scheme of events leading up to the lawsuit; nonetheless, it is undisputed that he was dismissed from the suit by plaintiffs.

Although it is not clear from the record, defendant Dr. Runstrom apparently filed for bankruptcy subsequent to the filing of this lawsuit. Thereafter, in January 1988, Dr. Runstrom died. Mrs. Runstrom, Dr. Runstrom's surviving spouse, was appointed special administrator of his estate as the cause of action pleaded by plaintiffs is one which survives the death of a party. Ill. Rev. Stat. 1987, ch. 110½, par. 27—6.

In July 1989, plaintiffs entered into a joint settlement agreement with Runstrom and Schafer. By its terms Runstrom agreed to pay $190,000 and Schafer agreed to pay $10,000 in exchange for plaintiffs' release of all claims against these defendants. The settlement agreement was made contingent upon

"[t]he execution and delivery to Plaintiffs by Mrs. Richard Runstrom as surviving spouse and as Special Administrator of the Estate of Richard Runstrom, M.D. of a waiver of any privilege of Richard Runstrom, M.D., or his estate that may be created by the physician/patient privileges available in the State of Illinois, under the Mental Health and Developmental Disabilities Confidentiality Act and/or the Medical Studies Act and her consent to the release of and delivery to the Plaintiff's [sic] attorneys any and all information, records and/or documents that otherwise would be privileged by reason of any of the above-stated privileges or Acts."

On August 10, 1989, the circuit court entered a written order finding that the above settlement agreement was made in good faith (Ill. Rev. Stat. 1987, ch. 70, par. 302(c)) and discharging Runstrom and Schafer from any liability to any tortfeasor for contribution pursuant to the provisions of section 2(d) of the Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 302(d)). On August 17, 1989, the circuit court entered a final order making an express finding pursuant to Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)) that the written order entered on August 10, 1989, was final and appealable and dismissing the complaint against defendants Runstrom and Schafer with prejudice. Defendants hospital and Dr. Butler filed a motion for leave to file counterclaims for contribution against Schafer and Runstrom which the circuit court denied. This timely appeal ensued whereby one issue is raised: whether the circuit court erred in finding that the settlement made between plaintiffs and defendants Runstrom and Schafer was made in good faith.

■■ ■ Section 2(a) of the Contribution Act provides that where two or more persons are subject to liability in tort arising from the same injury, there is a right of contribution among them. (Ill. Rev. Stat. 1987, ch. 70, par. 302(a).) However, an alleged tortfeasor who settles with a claimant in good faith is discharged from all contribution liability. (Ill. Rev. Stat. 1987, ch. 70, par. 302(d).) The Contribution Act does not define what constitutes a "good faith" settlement; the matter is largely left to the discretion of the trial court (*Dixon v. Northwestern Publishing Co.* (1988), 166 Ill. App. 3d 745, 751-52) based on arguments of counsel, affidavits, depositions, other discovery material, or evidence received at the hearing (*Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119, 128). Once the settling parties represent to the court that they have reached a good-faith settlement and its terms are made known to the court, a presumption of validity arises (*Ruffino v. Hinze* (1989), 181 Ill. App. 3d 827, 829), and the

burden of proof on the issue of good faith shifts to the party challenging the good-faith settlement (*Barreto*, 133 Ill. App. 3d at 128). In considering whether an agreement was made in good faith, the entire circumstances surrounding the settlement must be taken into account. (*Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 122.) A settlement may be considered made in good faith when it is based on consideration (*Doellman v. Warner & Swasey Co.* (1986), 147 Ill. App. 3d 842, 849-50; see also *Ballweg*, 114 Ill. 2d at 122) and when no tortious or wrongful conduct on the part of the settling party has been shown. (*Jachera v. Blake-Lamb Funeral Homes, Inc.* (1989), 189 Ill. App. 3d 281, 286.) Because Illinois' public policy favors peaceful and voluntary resolutions of claims through settlement agreements, clear and convincing evidence is required in order to establish the invalidity of such an agreement. *Jachera*, 189 Ill. App. 3d at 285.

Appellants, SwedishAmerican Hospital and Dr. Butler, argue that there was a lack of good faith in the instant settlement as evidenced by (1) Dr. Schafer's unreasonably low settlement of $10,000; (2) the joint insurer of Drs. Runstrom and Schafer holding Dr. Runstrom's insurance policy "hostage" in an attempt to force plaintiffs to accept an unreasonably low settlement for the case against Dr. Schafer; and (3) Dr. Runstrom's estate improperly attempting to waive certain medical privileges.

■ As to their first argument, the hospital and Dr. Butler maintain that "Dr. Schafer's $10,000 contribution is clearly disproportionate to any estimate of what her potential liability might be." They contend that plaintiffs' settlement demand against all defendants remained at $3 million up until the time the instant settlement was negotiated. However, as argued before the trial court, this is not an accurate summarization of the negotiations that occurred. Immediately prior to the settlement at issue here, all four remaining defendants put together a packaged offer totalling $450,000. Drs. Runstrom and Schafer were to contribute a total of $200,000 between them; the hospital was to contribute $200,000; and Dr. Butler was to contribute $50,000. That offer was made during the pendency of the first interlocutory appeal in this case (*i.e., Pritchard v. SwedishAmerican Hospital* (1989), 191 Ill. App. 3d 388) (*Pritchard I*). In *Pritchard I*, we held that certain information concerning Dr. Runstrom which was sought by plaintiffs from the hospital was privileged. The day on which we announced our decision in *Pritchard I*, April 25, 1989, the defendant hospital unilaterally withdrew its offer of $200,000. Thereafter, negotiations continued between plaintiffs and defendants Runstrom and Schafer. The $190,000 settlement at issue here was subse-

quently agreed upon. Thus, in light of the prior negotiations, the instant settlement would certainly appear to be reasonable.

However, appellants argue that Schafer's settlement contribution of $10,000 does not reasonably reflect the settlement of plaintiffs' claims against her. They cite to the serious injuries suffered by Linnea: specifically, permanent brain damage leaving her unable to speak, swallow, or move and confining her to a nursing home. Further, they argue that according to their expert's testimony, Schafer deviated from the standard of care by ordering that certain fluids be administered to Linnea without also ordering electrolyte testing.

■■ We find appellants' argument to be unpersuasive for two reasons. First, even assuming that Schafer's conduct on that occasion had been negligent, plaintiffs would still have to prove that Schafer's negligence was a proximate cause of Linnea's injury. (*Petkus v. Girzadas* (1988), 177 Ill. App. 3d 323, 327.) Plaintiffs' counsel advised the trial court that proving such a causal relationship was a "real problem" because Linnea did not develop her condition until a considerable period of time after Schafer's one-time involvement had ended, and several other physicians had intervened in Linnea's treatment subsequent to that time. Where probable recovery is questionable, compromise of a disputed claim is entirely compatible with the policy underlying the Contribution Act, that is, to encourage good-faith settlements. (*Mallaney v. Dunaway* (1988), 178 Ill. App. 3d 827, 833; *O'Connor v. Pinto Trucking Service, Inc.* (1986), 149 Ill. App. 3d 911, 915-16.) Thus, given the arguable lack of probable cause presented here, plaintiffs' settlement with Schafer would not appear to be unreasonable.

■■ Further, the argument of appellants that the amount of Schafer's settlement contribution did not reasonably reflect the settlement of plaintiffs' claims against her has currently been rejected. (*Christmas v. Hughes* (1989), 187 Ill. App. 3d 453, 455.) The mere fact that an injured party's actual damages exceed the amount of the settlement does not prove that the settlement was unreasonable. (*Mallaney*, 178 Ill. App. 3d at 833.) Therefore, given the above-mentioned circumstance, we do not find that the amount of settlement contribution paid by Schafer is sufficient indicia of bad faith.

As a second contention for their argument that the settlement agreement was not made in good faith, appellants maintain that Dr. Runstrom's insurance policy was held "hostage" by the joint insurer of Drs. Runstrom and Schafer in an effort to force an unreasonably low settlement against Dr. Schafer. Both Runstrom and Schafer are covered by the same insurer, Medical Protective Company. Appellants

maintain that Runstrom has a primary liability policy in the amount of $200,000 and Schafer has one in the amounts of $200,000/$600,000 plus an excess policy. Appellants theorize that because of Dr. Runstrom's death and bankruptcy, Medical Protective Company had no motive to pay Dr. Runstrom's $200,000 policy limits in settlement of plaintiffs' claim against Runstrom unless it could also eliminate its exposure for Dr. Schafer's liability under the separate $200,000/ $600,000 policy. Appellants argue that such a settlement agreement is not in good faith and " 'does not fairly and reasonably allocate' the settlement between Dr. Runstrom's estate and the highly culpable Dr. Schafer" (citing *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1989), 186 Ill. App. 3d 955, 963).

Appellants' reliance on *Blagg* for the proposition that the settlement agreement was not "fairly and reasonably" allocated is without merit. The settlement at issue in *Blagg* concerned the allocation of recovery for loss of consortium in light of a worker's compensation lien. Section 5(b) of the Workers' Compensation Act provides that an employer who has compensated an employee has a right to reimbursement from any compensation the employee receives from a suit against a third party. (Ill. Rev. Stat. 1987, ch. 48, par. 138.5(b); *Blagg,* 186 Ill. App. 3d at 959.) This court noted that we must not allow parties to circumvent clearly the employer's lien by apportioning the bulk of the recovery to a loss of consortium claim; rather, the court must protect the employer's right to reimbursement, which is to be given priority over the policy of favoring settlements. (*Blagg,* 186 Ill. App. 3d at 962.) We explained:

> "The Contribution Act requires that a release to a joint tortfeasor be made in good faith. The test for this case, however, goes beyond a determination of good faith. Section 5(b) of the Worker's Compensation Act provides that the court shall protect the employer's lien. Thus, regardless of whether a court might find the settlement to be in good faith, the court must consider whether the employer's lien is protected. *** [I]t must be determined whether the allocation is fair and reasonable. This determination should be made while keeping in mind the employer's lien." *Blagg,* 186 Ill. App. 3d at 963.

■ Given that there is no lien warranting protection in the case at bar, the additional requirement set forth in *Blagg* is simply inapplicable here. Thus, in determining whether the settlement was made in good faith, a review of the totality of the circumstances surrounding the settlement is necessary, including Runstrom's solvency and the extent of insurance coverage available. (*Wasmund v. Metropolitan Sani-*

*tary District* (1985), 135 Ill. App. 3d 926, 930, citing *River Garden Farms, Inc. v. Superior Court* (1972), 26 Cal. App. 3d 986, 103 Cal. Rptr. 498.) The mere fact that the settlement agreement may have been advantageous to a party is not necessarily an indicium of bad faith. (*McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 525.) As we have already determined, the probable recovery against Schafer was questionable. Further, given the condition of Dr. Runstrom and his estate, his exposure to liability was likely to be limited to the amount of his insurance policy. We believe that these are permissible circumstances to take into account when negotiating a settlement. As such, the totality of the circumstances does not indicate by clear and convincing evidence that the apportionment of the settlement was made in bad faith.

Finally, the nonsettling defendants argue that the waiver of privileges by Dr. Runstrom's estate was against public policy and the resulting settlement was, therefore, not made in good faith. As part of the settlement agreement, Mrs. Runstrom, as surviving spouse and special administrator of Dr. Runstrom's estate, agreed to waive *"any* privilege that *may be* created by the physician/patient privileges available in the State of Illinois, under the Mental Health and Developmental Disabilities Confidentiality Act and/or the Medical Studies Act." (Emphasis added.) Appellants argue that in light of this court's decision in *Pritchard I* such a waiver is against public policy. In *Pritchard I,* we found that the Medical Studies Act (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101 *et seq.*) protected from public disclosure that information relied upon by the hospital in reviewing Dr. Runstrom's privileges and competency to practice medicine at the hospital. (*Pritchard,* 191 Ill. App. 3d at 401.) We further held that information regarding whether Dr. Runstrom was a recipient of mental health services and his mental condition was privileged under the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1987, ch. 91½, par. 801 *et seq.*) and under the physician/patient privilege (Ill. Rev. Stat. 1987, ch. 110, par. 8—802). *Pritchard,* 191 Ill. App. 3d at 403-04.

██ █ Appellants contend that waiver of the above privileges is a "patent attempt to circumvent" this court's holding in *Pritchard I,* which they contend is against public policy. We disagree. First, Mrs. Runstrom's attempt to waive any privilege under the Medical Studies Act is likely to be ineffectual as the privilege belongs to the hospital and the members of the hospital's peer review committees, not to the doctor being evaluated.

The Medical Studies Act provides in pertinent part:

"All information, interviews, reports, statements, memoranda or other data of the *** committees of licensed or accredited hospitals or their medical staffs *** used in the course of internal quality control *** or for improving patient care, shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges ***." (Ill. Rev. Stat. 1987, ch. 110, par. 8—2101.)

The purpose of the Act "is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care." (*Jenkins v. Wu* (1984), 102 Ill. 2d 468, 479-80.) The belief is that "absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues." (*Jenkins*, 102 Ill. 2d at 480.) Because the privilege is not intended to benefit the physician being reviewed, that physician is unable to waive it, and any attempt to do so is likely to be ineffective. (See *Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 498.) Thus, this case is distinguishable from *Swank v. Bertuca* (1976), 41 Ill. App. 3d 229, where the parties' stipulation to waive objections, if enforced by the court, would have been effective in admitting inadmissible evidence.

■ Second, with respect to that information protected by the Mental Health and Developmental Disabilities Confidentiality Act and the physician/patient privilege, it is clear that Dr. Runstrom's estate can waive these privileges and allow disclosure of the confidential information concerning Runstrom as a patient. (See *Bland v. Department of Children & Family Services* (1986), 141 Ill. App. 3d 818, 826; *Novak v. Rathnam* (1985), 106 Ill. 2d 478, 484.) We find such a waiver to be permissible, effective, and consistent with public policy. We make no comment as to the necessity of also receiving the therapist's consent, as that issue is not before the court. Ill. Rev. Stat. 1987, ch. 91½, par. 805(e).

Because appellants have failed to present any evidence supporting their contention that the settlement was not entered into in good faith, much less the required clear and convincing evidence necessary to invalidate the settlement, we affirm the judgment of the circuit court.

Affirmed.

McLAREN and GEIGER, JJ., concur.