594 N.E.2d 1210 (1992)
230 Ill. App.3d 141
171 Ill.Dec. 690
Anna JESSEE, Plaintiff-Appellee,
v.
AMOCO OIL COMPANY, Defendant-Appellant (Standard Heating & Cooling Company, Defendant-Appellee; AMCO OIL COMPANY, Third-Party Plaintiff-Appellant, v. Tommy Baker, Roy Eanes, and Standard Heating & Cooling Company, Third-Party Defendants-Appellees).
No. 1-91-0519.
Appellate Court of Illinois, First District, Second Division.
May 19, 1992.
*1211 Robert H. Mittelman, Chicago (Fredrick B. Barder, of counsel), for appellee.
Pretzel & Stouffer, Chartered, Chicago (John V. Smith, II, Joseph M. Dooley, III with Robert Marc Chemers and Michael G. Bruton, of counsel), for appellant.
French Kezelis & Kominiarek, P.C., Chicago (David C. Burtker, Michael J. Ortyl and Daniel C. Hofert, of counsel), for defendant-appellee and third-party defendants-appellees.
Justice DiVITO delivered the opinion of the court:
Plaintiff Anna Jessee brought suit against defendants Amoco Oil Company (Amoco) and Standard Heating and Cooling Company (Standard Heating), alleging injuries from exposure to carbon monoxide sustained as a result of the negligent installation of a furnace in one of Amoco's gas stations. Both defendants filed counterclaims under the Illinois Contribution Among Joint Tortfeasors Act (Contribution Act). (Ill.Rev.Stat.1989, ch. 70, par. 302.) A jury returned a verdict for $525,000 in favor of plaintiff and against both defendants, attributing 95% fault to Standard Heating and 5% fault to Amoco. Subsequent to the verdict, plaintiff settled with Standard Heating for $400,000. Based upon a finding of good faith settlement, the circuit court vacated the judgment previously entered against Standard Heating on the jury's verdict and dismissed Amoco's *1212 contribution claim against Standard Heating. The court also denied Amoco's post trial motion.
Amoco appeals, contending that (1) the circuit court erred in denying its motion for a directed verdict; (2) the circuit court erred in allowing plaintiff's treating physician to testify to opinions beyond those disclosed in his discovery deposition; (3) the circuit court erred in finding that the post-judgment settlement between plaintiff and Standard Heating was made in good faith; and (4) the jury's award of $525,000 for plaintiff's pain and suffering was excessive and against the manifest weight of the evidence.
Sometime in 1982, Tommy Baker leased the service station at Broadway and Foster Avenues in Chicago from Amoco. The relationship between Amoco and Baker was governed by Amoco's Maintenance Policy and Guidelines, which provided that Amoco was responsible for major repairs at the station, including replacement of furnaces. Other operating procedures, such as the hiring of mechanics and clerks at the station, were within the province of the lessee, Baker.
At the time Baker entered the lease, the station consisted of a double service bay, several self-serve and full-serve pumps, a sales room, and a cashier's booth. The cashier's booth was a small brick room with one self-locking door and two bullet-proof glass windows with small slots where customers could pay the cashier. Sometime in late 1982 or early 1983, plaintiff was hired by Baker as the cashier for the station.
In November 1982, Amoco received a call that Baker's station was having problems with the heat. Amoco's supervisor of field maintenance, Sigurd Larson, was responsible for determining whether a new furnace was needed for the station and, as part of his duties, asked Wildwood, an independent heating and air conditioning contractor, to investigate the problem. After inspecting the old oil-fired furnace, Wildwood recommended its removal and replacement with a new furnace; Wildwood also submitted a bid for the work, which contained a notation for the installation of additional duct work. In addition to Wildwood's bid, Amoco solicited a bid from Standard Heating, which was $5 less than Wildwood's bid. Although Standard Heating's bid did not contain a notation for duct work to connect the furnace to the outside vent, Amoco accepted Standard Heating's bid. Standard Heating then hired a subcontractor, who installed the new furnace between December 10 and 13, 1982. A few days after the work, Standard Heating returned to the station and replaced a blower motor because the furnace would not start.
On January 31, 1983, Roy Eanes, a mechanic at the station, was working on a car in one of the service bays. When Eanes raised the running car on the hoist, the exhaust hose that had been discharging the fumes to the outside disconnected; rather than re-connect the hose to the car's exhaust pipe, Eanes raised the garage door approximately two feet to disperse the carbon monoxide fumes.
Shortly after her 3 p.m. shift began on that day, plaintiff, who was sitting in the cashier's booth, began feeling ill: she first noticed that she had a bad headache; then her heart began beating quickly; she become nervous and "panicky"; and she was unable to speak or move. With difficulty, plaintiff was able to get out of the booth and began vomiting.
An ambulance took plaintiff to Edgewater Hospital, where she was treated in a hyperbaric chamber for carbon monoxide poisoning. While at the hospital, plaintiff was examined by Dr. Claude Zanetti, who described her as "acutely delirious": she was confused, combative, anxious, upset, and thrashing about on the stretcher. At the time of her admittance, plaintiff's carbon monoxide level, normally 2% or less for a non-smoker, 6% for a smoker, was 41.6%. Following treatment in the hyperbaric chamber, plaintiff was released from the hospital the following day, apparently recovered with no residual side-effects; however, shortly after her release, Dr. Zanetti recommended that she consult a neurologist.
*1213 Over the course of the year, Dr. Zanetti examined plaintiff several times at the hospital. Although plaintiff was experiencing some medical problems, Dr. Zanetti initially did not attribute those problems to carbon monoxide poisoning. During his last examination of plaintiff on January 9, 1984, however, she complained of headaches, memory problems, and black spots in her vision. To Dr. Zanetti, those symptoms pointed to a possible chronic organic brain syndrome, or brain damage, resulting from carbon monoxide poisoning. Following a barrage of neuropsychological tests performed by Dr. Jack Arbit, a psychologist, Dr. Zanetti determined that plaintiff suffered from organic brain damage. Dr. Zanetti determined that the delay of plaintiff's symptoms was typical of carbon monoxide poisoning; occasionally recognition of carbon monoxide poisoning takes weeks or months.
The tests performed by Dr. Arbit indicated that plaintiff suffered from organic brain dysfunction; she showed signs of reduced intelligence, reduced intellectual function, reduced memory, dysphasia (impairment of speech), and some loss of coordination. In addition, Dr. Arbit's test results indicated that plaintiff was "depressed to the point where to some extent she has simply shut off psychologically"; he postulated that her depression resulted from her awareness of the neuropsychological damage she suffered. Based upon the results of the tests, Dr. Arbit diagnosed plaintiff as suffering from "organic brain disturbance or dysfunction."
Sometime after the incident, Amoco checked the station to determine the cause of the carbon monoxide leak. Its investigation revealed that the fresh air return was not re-connected to the new furnace, thus allowing carbon monoxide from the garage to seep into the ventilation system and circulate into the cashier's booth where plaintiff was working. Although Larson was aware at the time the new furnace was installed that new duct work was required to connect the furnace to the existing duct work, no such work was done, resulting in plaintiff's carbon monoxide poisoning. Eventually, Amoco hired and paid Standard Heating to install the additional duct work to connect the new furnace so that fumes from the service bays would be vented outside.
On January 10, 1984, plaintiff filed a complaint, alleging that Amoco negligently installed and maintained the heating and ventilation system at the service station. Thereafter, Amoco filed a third-party complaint against Standard Heating, mechanic Roy Eanes, and station operator Tommy Baker.[1] Plaintiff later filed an amended complaint asserting a claim directly against Standard Heating.
On November 10, 1990, the jury returned a verdict in favor of plaintiff and against both Amoco and Standard Heating in the amount of $525,000 for pain and suffering, finding Amoco 5% at fault and Standard Heating 95% at fault.
Prior to the circuit court's ruling on the post trial motions, but after judgment was entered on the verdict, plaintiff settled with Standard Heating for $400,000, more than $50,000 less than the amount of recoverable damages apportioned to Standard Heating by the jury. Over objections by Amoco, the circuit court found the settlement to be in good faith, vacated the judgment against Standard Heating, and dismissed Amoco's contribution claim. The court further denied Amoco's post trial motion. Amoco appeals from these orders.

I.
Amoco initially contends that the circuit court erred in not granting its motion for a directed verdict. Specifically, Amoco maintains that it cannot be held liable for the alleged negligent replacement of the old furnace or the construction on the duct work because Standard Heating, an independent contractor, performed the work.
*1214 In response, plaintiff asserts that Amoco retained control over the additional duct work portion of the job because Amoco failed to hire an independent contractor to install the duct work. Plaintiff argues that, because the bid for work submitted by Standard Heating did not specifically refer to the duct work necessary to properly install the new furnace, Amoco should be liable for Standard Heating's failure to install. Plaintiff maintains that Amoco was aware of the necessity of the duct work and was moreover apprised of its necessity by Wildwood's bid which included a notation for such work. Further, plaintiff maintains that Amoco was negligent in failing to inspect Standard Heating's work and discover the patent defect in the ventilation system.
Generally, an employer of an independent contractor is not liable for the acts or omissions of the independent contractor; however, an exception to the rule provides that an employer who retains control of any part of the work will be liable for injuries resulting from his failure to exercise his right of control with reasonable care. (Claudy v. City of Sycamore (1988), 170 Ill.App.3d 990, 995, 120 Ill.Dec. 812, 524 N.E.2d 994; Spivey v. Brown (1986), 150 Ill.App.3d 139, 143, 103 Ill.Dec. 876, 502 N.E.2d 23.) The rule is subject to exception also where the employer orders or directs the acts causing the harm or where the employer negligently selects an incompetent contractor. Dvorak v. Primus Corp. (1988), 168 Ill.App.3d 625, 633, 119 Ill.Dec. 219, 522 N.E.2d 881.
In view of the evidence presented in the case at bar, taken with its intendments most favorable to plaintiff, we find that the circuit court properly denied Amoco's motion for a directed verdict. (See Pedrick v. Peoria & Eastern R.R. Co. (1967), 37 Ill.2d 494, 229 N.E.2d 504.) Although Amoco contends that plaintiff's assertion that Amoco controlled the duct work places a "difficult" and "impossible" burden upon an employer to detail every aspect of work to be performed, the evidence adduced at trial supports plaintiff's contention that Amoco retained control of the additional duct work portion of the furnace replacement.
The record establishes that Amoco knew that the additional duct work was an "important" part of the bid. From the evidence at trial the jury could conclude that Amoco chose to hire the independent contractor whose bid failed to include duct work, although it had already received a bid from another contractor which noted the duct work. Amoco asserts that the "only reasonable inference which can be drawn from this testimony" is that Amoco, based on custom and practice, understood that Standard Heating's bid was for the complete replacement of the furnace, including the duct work; however, Amoco has failed to provide any explanation for its subsequent payment of $375 to Standard Heating for installation of the missing duct work. Amoco's contention, that a "myriad" of reasons, from good business relations to oversight, explain the subsequent payment and installation, is not borne out by the record.
Rather, we find that, in the case sub judice, there was sufficient evidence for the jury to conclude that Amoco knew that duct work was necessary but hired a contractor whose bid did not include the duct work, and that in so doing, Amoco retained the control and the responsibility of installing the duct work. Accordingly, we hold that the circuit court did not err in denying Amoco's motion for a directed verdict.

II.
Amoco next contends that the circuit court erred in allowing Dr. Zanetti, plaintiff's treating physician, to render opinions not disclosed in his discovery deposition. Specifically, Amoco maintains that Dr. Zanetti, in his discovery deposition, did not rely upon Dr. Arbit's report on plaintiff to form his opinions; however, at trial, he relied upon that report. Amoco asserts that this was error pursuant to Supreme Court Rule 220(d). 134 Ill.2d R. 220(d).
Rule 220, governing the disclosure and discovery of expert witnesses, provides in pertinent part:
"(b) Disclosure.

*1215 (1) * * * In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party * * *.
* * * * * *
(d) Scope of Testimony. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings * * *, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. * * *." (134 Ill.2d R. 220.)
Rule 220(a)(1) defines an "expert" as
"a person who * * * possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion * * * at trial." 134 Ill.2d R. 220(a)(1).
Amoco's argument is premised upon its assertion that Dr. Zanetti falls within the definition of an "expert" and, as such, his testimony at trial cannot contradict or even supplement, as Amoco argues it did here, his opinions disclosed in his deposition. (134 Ill.2d R. 220(a)(1), (d).) Although Amoco does not argue that plaintiff was required to disclose Dr. Zanetti as an expert witness (134 Ill.2d R. 220(b)(1)) or that she was required to comply with the discovery requirements of expert witnesses (134 Ill.2d R. 220(c)), Amoco maintains that the scope of Dr. Zanetti's testimony at trial is governed by Rule 220(d).
An expert who acquires information because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit rather than acquiring information because a lawsuit is contemplated or is pending should be treated as an ordinary witness; thus, Rule 220 disclosure and discovery provisions do not apply to treating physicians. Wilson v. Chicago Transit Authority (1988), 126 Ill.2d 171, 127 Ill. Dec. 812, 533 N.E.2d 894; Tzystuck v. Chicago Transit Authority (1988), 124 Ill.2d 226, 124 Ill.Dec. 544, 529 N.E.2d 525; Cochran v. Great Atlantic & Pacific Tea Co. (1990), 203 Ill.App.3d 935, 940, 148 Ill. Dec. 923, 561 N.E.2d 229; see also Boatmen's National Bank v. Martin (1992), 223 Ill.App.3d 740, 742-43, 166 Ill.Dec. 306, 585 N.E.2d 1328.
Both Wilson and Tzystuck considered the issue of whether a treating physician who will testify to a medical opinion at trial need be disclosed as an expert witness within the meaning of Rule 220(b)(1). In Wilson, the court held that, although a treating physician's identity is discoverable under Supreme Court Rule 201(b)(1), a plaintiff is not mandated to disclose a treating physician as an expert witness pursuant to Rule 220. (Wilson, 126 Ill.2d 171, 176-77, 127 Ill.Dec. 812, 533 N.E.2d 894.) Likewise, the supreme court in Tzystuck "rejected the notion that treating physicians are to be regarded as expert witnesses under Rule 220." Tzystuck, 124 Ill.2d 226, 239, 124 Ill.Dec. 544, 529 N.E.2d 525.
Amoco asserts, however, that Wilson and Tzystuck are limited in application only to those issues pertaining to disclosure of experts or treating physicians; Amoco maintains that limitations of an expert's scope of testimony, governed by Rule 220(d), apply in the instant case to a treating physician. For support, Amoco relies upon Karr v. Noel (1991), 212 Ill.App.3d 575, 156 Ill.Dec. 684, 571 N.E.2d 271, where a treating physician, also a defendant in the litigation, testified at trial that certain medical texts were authoritative. During his deposition, however, the treating physician was unable to name any authoritative medical texts upon which he relied. In holding that the treating physician's testimony exceeded that of his deposition, the court in Karr held that a "defendant physician may still be an expert witness for the purpose of sections (c) and (d) [of Rule 220]. He is subject to discovery by deposition only, and the scope of his testimony at trial may not exceed that of his deposition testimony." Karr, 212 Ill.App.3d 575, 583, 156 Ill.Dec. 684, 571 N.E.2d 271.
Notwithstanding the holding in Karr, we conclude that the circuit court did not err in *1216 allowing Dr. Zanetti's testimony. As the supreme court made clear in Tzystuck, treating physicians do not fall under the rubric of expert witnesses as defined by Rule 220. Here, Dr. Zanetti, unlike the physician in Karr, was not a party to the litigation; rather, Dr. Zanetti was clearly called to testify as plaintiff's treating physician and his testimony at trial concerned only his treatment of plaintiff and his subsequent diagnosis of her ailment.
Moreover, the record in the case at bar discloses that Dr. Zanetti's testimony at trial did not differ in any significant manner from his deposition. During his deposition, Dr. Zanetti stated that, when he released plaintiff from the hospital, he thought she had had an apparent recovery; however, he recommended that she undergo neurological tests. Only after several months had passed did Dr. Zanetti determine that plaintiff's delayed symptoms signified permanent neurological damage from carbon monoxide poisoning. At the time of his deposition, Dr. Zanetti stated that his opinion of plaintiff's condition was not based upon any neurological tests; however, he did acknowledge that, to diagnose organic brain syndrome, he would refer a patient for detailed neurological testing and rely upon those tests. Dr. Zanetti's reliance on Dr. Arbit's test results for his testimony at trial thus did not differ from, but rather was consistent with, his deposition testimony in which he stated that he would rely upon neurological tests to determine the effects of carbon monoxide exposure.
Accordingly, we find that the circuit court did not err in allowing Dr. Zanetti's testimony.

III.
Amoco next asserts that the circuit court erred in finding that the post-judgment settlement between Standard Heating and plaintiff was made in good faith. Because plaintiff will recover the full amount of her judgment regardless which defendant ultimately bears the burden of satisfying it, she offers no response to Amoco's contention. (See Henry v. St. John's Hospital (1990), 138 Ill.2d 533, 150 Ill.Dec. 523, 563 N.E.2d 410.) Standard Heating, however, responds that its settlement with plaintiff was indeed made in good faith and thus, the court's order dismissing Amoco's contribution claim against it should be affirmed.
Section 2 of the Contribution Act provides that where two or more persons are subject to liability in tort arising out of the same occurrence, there is a right of contribution among them. (Ill.Rev.Stat.1987, ch. 70, par. 302.) Section 2 also provides that a tortfeasor to whom a release in settlement is given in good faith is discharged from all liability for any contribution to any other tortfeasor. Ill.Rev.Stat.1987, ch. 70, pars. 302(c), (d); Perez v. Espinoza (1985), 137 Ill.App.3d 762, 764-65, 92 Ill.Dec. 377, 484 N.E.2d 1232.
The Contribution Act, though, does not define "good faith." (Pritchard v. SwedishAmerican Hospital (1990), 199 Ill. App.3d 990, 996, 146 Ill.Dec. 46, 557 N.E.2d 988.) The Illinois Supreme Court has stated, however, that when determining whether a settlement was entered into in good faith, courts must take into account the entire circumstances surrounding the settlement. Wilson v. Hoffman Group, Inc. (1989), 131 Ill.2d 308, 318, 137 Ill.Dec. 579, 546 N.E.2d 524; Ballweg v. Springfield (1986), 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373.
Where there is a resolution of a claim by virtue of a settlement, and the terms of the settlement are made known to the court, there has been a preliminary showing of good faith which creates a presumption of validity. (Snoddy v. Teepak, Inc. (1990), 198 Ill.App.3d 966, 969, 145 Ill.Dec. 64, 556 N.E.2d 682.) Because public policy favors the peaceful and voluntary resolution of disputes through settlement, any assertion of bad faith must be proved by clear and convincing evidence by the party claiming absence of good faith. Argueta v. Baltimore & Ohio Chicago Terminal R.R. (1991), 224 Ill.App.3d 11, 22, 166 Ill.Dec. 428, 586 N.E.2d 386; Banks v. R.D. Werner Co. (1990), 201 Ill.App.3d 762, 770, 147 Ill.Dec. 217, 559 N.E.2d 217; Pritchard, *1217 199 Ill.App.3d 990, 997, 146 Ill.Dec. 46, 557 N.E.2d 988; McKanna v. Duo-Fast Corp. (1987), 161 Ill.App.3d 518, 525, 113 Ill.Dec. 348, 515 N.E.2d 157.
The invalidity of a settlement agreement is shown by demonstrating collusion, fraud, mutual mistake, and tortious or wrongful conduct. (Snoddy, 198 Ill. App.3d 966, 969, 145 Ill.Dec. 64, 556 N.E.2d 682.) When one tortfeasor chooses to settle and another chooses to continue to litigate, inequality in the ultimate cost does not signal bad faith; the mere fact that a settlement agreement may have been advantageous to a party is not necessarily an indicium of bad faith. (Pritchard, 199 Ill. App.3d 990, 1000, 146 Ill.Dec. 46, 557 N.E.2d 988; McKanna, 161 Ill.App.3d 518, 525, 113 Ill.Dec. 348, 515 N.E.2d 157.) Nor is bad faith necessarily indicated where a settlement has been made simply to avoid third party liability. Christmas v. Hughes (1989), 187 Ill.App.3d 453, 135 Ill.Dec. 39, 543 N.E.2d 274.
In the case sub judice, plaintiff and Standard Heating settled for $400,000 after the jury returned a $525,000 verdict for plaintiff. Based upon the jury's apportionment of fault, Standard Heating was liable for $453,182.30 of the judgment. Thus, in settling with plaintiff, Standard Heating avoided $53,182.30 in liability.
Although Amoco does not point to any evidence in the record which would indicate collusion or fraud in the settlement, it nonetheless urges this court to find that "without some good cause shown, a post-judgment settlement for less than the amount of liability apportioned to the settling defendant should not extinguish a non-settling defendant's contribution claim." Such a finding, however, would be contrary to the Contribution Act.
The ability to extinguish the right of contribution is expressed in clear and unambiguous language. Although it is the duty of a reviewing court, when interpreting a statute, to determine the intent of the legislature when enacting a statute, the rules of statutory construction require this court to first look to the statutory language itself as the best indication of the intent of the drafters. (Henry, 138 Ill.2d 533, 541, 150 Ill.Dec. 523, 563 N.E.2d 410.) Nowhere in the Contribution Act does the legislature distinguish between pretrial or post-judgment settlements; rather, section 2 provides clearly that "[t]he tortfeasor who settles with a claimant * * * is discharged from all liability for any contribution to any other tortfeasor." Ill.Rev.Stat. 1987, ch. 70, par. 302(d).
Moreover, Amoco's reliance on the dissenting opinion in Henry, stating that "[s]ettlement agreements should not be used as an instrument of conspiracy to `gang up on' a nonsettling defendant" (Henry, 138 Ill.2d 533, 553, 150 Ill.Dec. 523, 563 N.E.2d 410 (Ryan, J., dissenting)) is not persuasive. In Henry, the plaintiff and one defendant, found 93% at fault, settled for an amount substantially less than what that defendant was liable for after the verdict of the jury. The majority upheld the settlement although it did "not decide, however, whether a settlement between a joint tortfeasor and a plaintiff, entered into after a jury has determined the amount of each joint tortfeasor's pro rata share of the judgment amount, which settlement results in one joint tortfeasor's paying substantially less than its pro rata share while cutting off that tortfeasor's contribution liability to the remaining tortfeasors, is a good-faith settlement under the Contribution Act." (Henry, 138 Ill.2d 533, 547-48, 150 Ill.Dec. 523, 563 N.E.2d 410.) The dissent found the result, making the non-settling defendant, who was liable only for $715,559.07 prior to the settlement, liable for $5,511,759, "terribly wrong." Henry, 138 Ill.2d 533, 550-51, 150 Ill.Dec. 523, 563 N.E.2d 410 (Ryan, J., dissenting).
In the instant case, Standard Heating, unlike the defendant in Henry, is not liable for substantially less than its pro rata share. Moreover, there exist several reasons why plaintiff would settle with Standard Heating subsequent to a judgment, none of which point to collusion or fraud. At the time of the settlement, post trial motions were pending; a viable explanation for plaintiff's settlement is that she anticipated a lengthy appeal process which *1218 might have forestalled collection of her judgment, providing an impetus for her to settle. A further reason for settlement while post trial motions were pending could be plaintiff's desire to settle in order to achieve some measure of certainty.
Because it is not the function of a reviewing court to substitute its judgment for that of the circuit court and mindful that the court was involved in the settlement process and heard all the evidence, we will not interfere with the circuit court's finding of a good faith settlement. Ballweg, 114 Ill.2d 107, 122, 102 Ill.Dec. 360, 499 N.E.2d 1373; Argueta, 224 Ill.App.3d 11, 23, 166 Ill.Dec. 428, 586 N.E.2d 386.

IV.
Amoco lastly asserts that the jury award of $525,000 for plaintiff's pain and suffering is not supported by the evidence. Specifically, Amoco maintains that because the jury awarded no damages for disability or lost earnings, it necessarily found that plaintiff suffered no permanent injuries; thus, Amoco argues that the jury's award "for pain and suffering associated with one day in the hospital and the few weeks before Dr. Zanetti noted that the plaintiff appeared to be fully recovered is clearly excessive and should be shocking to the judicial conscience."
An award of damages is excessive and unfair if the amount falls outside the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. (Malfeo v. Larson (1990), 208 Ill.App.3d 418, 425, 153 Ill.Dec. 406, 567 N.E.2d 364.) Correspondingly, damages are particularly within the province of the trier of fact and a reviewing court will not disturb them on appeal unless obviously the result of passion or prejudice. Malfeo, 208 Ill.App.3d 418, 425, 153 Ill.Dec. 406, 567 N.E.2d 364.
In the instant case, although the jury awarded no damages for lost earnings or for disability, its award for pain and suffering was not excessive based upon the record in the instant case. Dr. Arbit testified at trial that plaintiff permanently suffered reduced intelligence, reduced memory, dysphasia, and some loss of coordination. Further, as a result of the neuropsychological damage she suffered, plaintiff was severely depressed and unable to function in the same capacity as prior to the incident. Notwithstanding the jury's failure to award damages for lost earnings or for disability, the award certainly falls within the "flexible limits of fair and reasonable compensation." Cf. Martin v. Cain (1991), 219 Ill.App.3d 110, 161 Ill.Dec. 515, 578 N.E.2d 1161.
Accordingly, based on the foregoing, the judgment of the circuit court of Cook County is affirmed.
Affirmed.
HARTMAN, P.J., and SCARIANO, J., concur.
NOTES
[1] Standard Heating eventually filed a counterclaim against Amoco and a third-party action against the subcontractor who installed the furnace. Eanes was never served and never appeared in the case; the subcontractor was dismissed from the case prior to trial pursuant to a settlement; and Baker settled with plaintiff prior to the jury's verdict.